493 S.E.2d 845

**The STATE, Respondent,**

v.

**Johnny O'Landis BENNETT, Jr., Appellant.**

No. 24718.

Supreme Court of South Carolina.

Heard Oct. 7, 1997.

Decided Dec. 1, 1997.

Daniel T. Stacey, Chief Attorney, South Carolina Office of Appellate Defense, Columbia, for appellant.

Attorney General Charles M. Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General William Edgar Salter, III, Columbia, and Solicitor Donald V. Myers, Lexington, for respondent.

WALLER, Justice:

Appellant, Johnny O'Landis Bennett (Bennett), was convicted of murder, kidnaping, armed robbery and grand larceny. He was sentenced to death for the murder, and consecutively

sentenced to 25 years, and 5 years for armed robbery and larceny. We affirm the convictions but reverse and remand for a new sentencing proceeding.

## FACTS

The victim in this case, 24 year old Benton Smith (Victim), disappeared on Tuesday, November 27, 1990. He was last seen leaving his residence in the Happy Town area of Gaston, South Carolina with Bennett. The two left in Victim's 1980 Toyota, en route to cash Victim's $147.00 unemployment check. Victim cashed his check at 11:56 AM; this was the last time he was seen alive. Bennett was seen driving Victim's automobile later that day; he gave a number of items from Victim's car to friends.

Victim's car was subsequently found outside the school where Bennett's mother worked. After giving a number of conflicting statements to police, Bennett confessed to the murder,[1] and led police to Victim's body near his sister's home.

An autopsy revealed 70–75 stab wounds, primarily to Victim's head, neck and upper back, inflicted with a Phillips head screwdriver. The cause of death was internal bleeding or asphyxiation secondary to the stab wounds.

## ISSUES [2]

1. Was Juror Number 137 improperly qualified?
2. Was Bennett denied of the opportunity to speak with the Victim's father?
3. Was Bennett's character improperly placed into evidence by the State?
4. Did the court erroneously charge the jury with respect to the elements of armed robbery?
5. Did the state sufficiently prove the corpus delicti of the crime of kidnaping independent of Bennett's statements to police?

---

1. However, he maintained his innocence at trial.

2. Although unnecessary to our decision today, we address a number of the sentencing phase issues in order to prevent their recurrence at resentencing.

6. Was the aggravating circumstance of torture properly submitted to the jury?

7. Was Bennett deprived of the ability to make a religious argument to the sentencing phase jury?

8. Did the court err in refusing to order the personnel records of certain prison guards be disclosed to Bennett?

## 1. JUROR ROPER

■ At the end of the *voir dire* of Juror Number 137, the following occurred:

Mr. Floyd: ... [D]o you understand that if—if the jury were to consider giving the defendant the death penalty, that all twelve jurors would have to sign on that portion of the verdict concerning the death penalty. Do you understand me on that?

A: I understand you.

Q: **Now, if you had some reservations or doubt after hearing everything as to whether or not the defendant should get the death penalty and all eleven other jurors put their name on the list, could you stand up to that and not put your name on the list?**

A: **I believe I would have to go with the majority of the jury.**

(Emphasis supplied). The state made no attempt at rehabilitation.

Defense counsel objected to the juror's qualification on the ground Bennett would be denied an independent decision as to his punishment by having a juror who would "go along with the majority." The trial court ruled the juror qualified. Juror Number 137 was thereafter seated on the jury after the defense had exercised all of its peremptory challenges. Bennett contends the juror was erroneously qualified. We agree.

■ In a capital case, the proper standard in determining the qualification of a prospective juror is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *State v. Green,* 301 S.C. 347, 392 S.E.2d 157, *cert. denied,* 498 U.S. 881, 111 S.Ct. 229, 112 L.Ed.2d 183 (1990) (*citing Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844,

853, 83 L.Ed.2d 841 (1985)); *State v. George,* 323 S.C. 496, 476 S.E.2d 903 (1996), *cert. denied* —— U.S. ——, 117 S.Ct. 1261, 137 L.Ed.2d 340 (1997). The determination of whether a juror is qualified to serve on a death penalty case is within the sole discretion of the trial judge and is not reviewable on appeal unless wholly unsupported by the evidence. *State v. Davis,* 309 S.C. 326, 422 S.E.2d 133 (1992), *cert. denied,* 508 U.S. 915, 113 S.Ct. 2355, 124 L.Ed.2d 263 (1993). When reviewing the trial court's qualification or disqualification of prospective jurors, the responses of the challenged jurors must be examined in light of the entire *voir dire. State v. Green, supra.* The ultimate consideration is that the juror be unbiased, impartial and able to carry out the law as explained to him. *Id.*

In *Wainwright, supra,* the United States Supreme Court rejected the notion that a prospective juror in a capital case could only be challenged for cause if it were demonstrated the juror "unequivocally stated she would automatically be unable to give a death sentence," 469 U.S. at 419, 105 S.Ct. at 849. More recently, the Court recognized that a capital defendant may challenge for cause any prospective juror who indicates he or she will automatically vote for death in every case. *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). "If even one such juror is impaneled and the death sentence is imposed, the State is disentitled to execute sentence." *Id.* at 729, 112 S.Ct. at 2230. The *Morgan* court rejected the state's claim that general questions of fairness and impartiality were in all cases sufficient to detect unqualified jurors, stating:

... such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed.

504 U.S. at 735, 112 S.Ct. at 2233.

Here, we find the juror's earlier generalized statements that he could be fair and impartial and follow the law insufficient to cure his later, unequivocal response that if the other eleven jurors voted for death, he would "have to go with the majority of the jury." The juror's responses to the general *voir dire* inquiry left uncovered the critical fact that he would not have

been "able to carry out the law as ... explained to him," *State v. Green, supra,* but would, instead, have followed the majority. Accordingly, the trial court's ruling that the juror qualified to serve is "wholly unsupported by the evidence," and the case must be remanded for resentencing.[3]

## 2. VICTIM'S FATHER

Prior to trial, Victim's father, Paul Smith, advised defense counsel he had been told by the solicitor not to talk to the defense. Bennett claims this resulted in a due process violation. We disagree.

According to co-counsel for Bennett, they went to Smith's house on August 10, 1995,[4] and asked to speak to him about the case; Smith replied that the last time this case had come up for trial, sometime in 1993, he had been instructed by several attorneys at the solicitor's office to say he had no comment about the case. At a hearing before the trial court on Aug. 17, 1995, the solicitor advised that nobody in his office had authorization to advise Smith not to talk to the defense. The solicitor then suggested that he could get the Smith family in his office, advise them in defense counsel's presence that they could talk to the defense, and that if anyone from the solicitor's office had ever advised them differently to disregard it. After hearing testimony from defense counsel, the court issued an order on August 17, 1995 which was disseminated to the clerk of court and defense counsel. The order provides that any witness has the absolute right to talk or not talk to a person and that the decision is to be made by the witness. The order provides that it is to be disseminated to any witness.

The trial in this case did not begin until nearly two months later, on October 9, 1995. There is absolutely no indication in the record that defense counsel sought to speak with Mr.

---

**3.** Juror Number 137's responses in no way reflect upon his ability to serve in the guilt phase of the trial, nor does Bennett suggest the juror was disqualified in that regard. On the contrary, in his brief and at oral argument before this Court, Bennett sought only a resentencing in this regard. Accordingly, our holding on this issue has no impact on the guilt phase of the trial.

**4.** The trial in this case was scheduled to begin on October 9, 1995.

Smith during this two month period. Accordingly, it is possible that, had counsel attempted to do so, Smith may have consented to talk to the defense. Having made no such showing, Bennett has failed to demonstrate substantial interference with his right to speak with Smith. *See State v. Williams,* 326 S.C. 130, 485 S.E.2d 99 (1997) (where government improperly interferes with witnesses right to talk with defense, defendant must demonstrate both substantial interference and prejudice in order to obtain relief).

Moreover, the present record demonstrates no prejudice. Contrary to Bennett's contention, Smith's testimony was not "critical" but was, rather, cumulative to other testimony in the record. *State v. McLeod,* 303 S.C. 420, 401 S.E.2d 175 (1991) *overruled in pt. on other grnds, State v. Evans,* 307 S.C. 477, 415 S.E.2d 816 (1992); *State v. Galloway,* 305 S.C. 258, 407 S.E.2d 662 (Ct.App.1991) (no prejudice to defendant where testimony is cumulative to other evidence in the record). We find no error.

### 3. EVIDENCE OF BENNETT'S CHARACTER

■ Bennett next contends the State improperly introduced testimony which reflected upon his character. We disagree.

At trial, Bennett denied killing Victim and claimed the last time he had seen him, Victim was with their mutual friends, Tommy Furtick, Andre Haskins and Isadore Mack. He claimed he had seen Victim alive on Thursday morning. In reply, the state presented the testimony of Isadore Mack who denied having seen Victim on Tuesday, Wednesday or Thursday. During his questioning, Mack testified he, Furtick and Haskins had run into Bennett on Wednesday, Nov. 28, 1990 (the day after Victim disappeared) and they all went to an Orangeburg motel. Mack testified that the next morning, the four of them went back to Swansea. He was then questioned whether the four of them had gotten separated, in Swansea, when the following exchange occurred:

A. Yeah, we got separated. We—some guys stopped us and—

Q. Okay, don't tell me what some other guys said ... tell what you did as a result of your conversation with the other fellows.

A. We—we gave him some drugs and told him to stand on the corner and sell these until we get back.

Q. Talking about who.

A. Johnny.

Mr. Floyd. Objection, Your Honor. We object.

Mr. Humphries: Your Honor, They've opened that door. You've already discussed that prior.

Court. Well, proceed from this point. Let's go forward.

Bennett claims Mack's testimony improperly placed his character in issue. We disagree.

■ As an initial matter, Bennett's objection to the question is too vague to preserve any issue for review. *State v. Bailey,* 253 S.C. 304, 170 S.E.2d 376 (1969); 4 C.J.S. *Appeal and Error* § 215 (1993) (trial judge commits no error in overruling general objection). Here, as Bennett stated no grounds for his objection, there is nothing for this Court to review.

In any event, we find Mack's testimony was relevant to rebut earlier testimony elicited of Bennett's girlfriend, Bonita Gonsalves. Gonsalves testified that on the day of Victim's disappearance, Bennett came to her house driving Victim's vehicle. He had bandages on his hand and when questioned about them, he told Gonsalves he had been in a fight with someone who had given her drugs. The clear inference to be drawn from Gonsalves' testimony was that Bennett was opposed to drugs. Mack's reply testimony implying that Bennett was not as adamantly opposed to drugs as claimed by Gonsalves was therefore within realm of permissible reply. *State v. Doby,* 273 S.C. 704, 258 S.E.2d 896 (1979); *State v. Outen,* 237 S.C. 514, 118 S.E.2d 175, *cert. den.,* 366 U.S. 977, 81 S.Ct. 1948, 6 L.Ed.2d 1266 (1961), *overruled in part on other grds. State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991).

### 4. ARMED ROBBERY

In charging the jury on implied malice necessary to sustain a murder conviction, the trial court stated that "if one intentionally kills another with a deadly weapon, the implication of malice may arise." Immediately, thereafter, he defined a deadly object as follows:

Under the law of the state of South Carolina, an object not normally considered a dangerous or deadly object may under some circumstances be used in a fashion or in such a manner as to constitute a dangerous or deadly object. It is for you, the jury, to determine and decide in this case beyond a reasonable doubt whether a deadly or dangerous object was used.... Under the law of the state of South Carolina, **the hand or fist of a person is not normally considered a dangerous or deadly object, but under some circumstances a hand or fist of a person may be used in such a fashion or in such a manner to constitute a dangerous or deadly object.**

(Emphasis supplied). Thereafter, in charging the jury on the offense of armed robbery, the court noted that any person convicted of the crime of robbery while armed with a deadly weapon is guilty of armed robbery. *See* S.C.Code Ann. § 16–11–330. The court noted that to commit armed robbery, the robbery must have been committed with a deadly weapon and stated, "Heretofore, I have defined for you in detail what a deadly object or deadly weapon is."

■ Bennett contends the court erred in charging the jury that a hand or fist could, under some circumstances, be considered a deadly weapon for purposes of **armed robbery**. He contends that, unlike murder, a hand or fist may not be considered a deadly weapon for purposes of armed robbery.[5]

■ As an initial matter, we note that Bennett's objection at trial does not encompass his present argument. Counsel's only objection to the charge given, as it related to both murder and armed robbery, was that the judge's use of the term "deadly object" was confusing and that the court should have used the term "deadly weapon." At no point did Bennett contend a hand or fist could not be considered a deadly weapon for purposes of armed robbery. Bennett's current argument is clearly not encompassed in his objection to the trial court's instructions; accordingly, this issue is unpreserved. *State v. Hudgins,* 319 S.C. 233, 460 S.E.2d 388 (1995),

---

5. He makes the same contention with respect to the aggravating circumstances of robbery while armed with a deadly weapon and larceny while armed with a deadly weapon, both of which were submitted to the sentencing phase jury.

*cert. denied* 516 U.S. 1096, 116 S.Ct. 821, 133 L.Ed.2d 764 (1996) (party may not argue one ground below then argue different ground on appeal); *State v. Bailey,* 298 S.C. 1, 377 S.E.2d 581 (1989). In any event, however, we find no error in the trial court's charge under the circumstances of this case.

There is a split of authority in other jurisdictions as to whether or not hands, fist, teeth, and the like may be considered deadly weapons for purposes of offenses such as assault and robbery. *See generally* Vitauts Gulbis, Annotation, *Parts of the human body, other than feet, as deadly or dangerous weapons for purposes of statutes aggravating offenses such as assault and robbery,* 8 A.L.R.4th 1268 (1981). Under the law of this state, and the facts of this case, however, we find the trial court properly charged the jury.

 A deadly weapon is generally defined as any article, instrument or substance which is likely to produce death or great bodily harm. *State v. Scurry,* 322 S.C. 514, 473 S.E.2d 61 (Ct.App.1996); *State v. Campbell,* 287 S.C. 377, 339 S.E.2d 109 (1985). The question of whether an instrument used in the commission of a robbery qualifies as a deadly weapon, thereby qualifying the incident as armed robbery, is a factual determination for the jury. *State v. Gourdine,* 322 S.C. 396, 472 S.E.2d 241 (1996); *State v. Tasco,* 292 S.C. 270, 356 S.E.2d 117 (1987).

Although we have not specifically addressed whether a hand or fist may be considered a deadly weapon for purposes of armed robbery, we have held, in the context of murder, that a hand or fist may be considered a deadly weapon depending on the factual circumstances. **"Whether an object has been utilized as a deadly weapon depends upon the facts and circumstances of each case."** *State v. Davis,* 309 S.C. 326, 422 S.E.2d 133 (1992) (emphasis supplied). Although *Davis* was a murder case, nothing in our opinion limits its application to murder.[6]

---

6. We decline to limit the application of *Davis* in such a manner as to produce the incongruous result of permitting a jury to find that a hand may constitute a deadly weapon for purposes of the greater offense of murder, but could not be a deadly weapon for purposes of armed robbery. Similarly, we decline to permit the untenable result that a toy which is incapable of producing bodily injury may be deemed a deadly

██ We find the factual circumstances of this case sufficient to submit the issue to the jury. In one of his statements to police, Bennett admitted he had struck Victim in the jaw hard enough to knock him unconscious. Additionally, there is evidence that the blow to the chin suffered by Victim was typical of that found in people who die in prize fights, and that it could have caused a fatal concussion. Moreover, given the disparity of size between the Victim and Bennett (Victim was 5′8″ tall and weighed 135 pounds; Bennett is 6′5″ tall and weighs approximately 235–240 pounds), we hold that it was for the jury to determine whether the hand or fist was a deadly weapon.

██ Finally, even were we to hold that hands or fists may not be deemed deadly weapons for purposes of armed robbery, Bennett suffered no prejudice in this case. It is undisputed that Victim was stabbed some 70–75 times with a Phillips head screwdriver, and Bennett raises no contention that the screwdriver was not a deadly weapon. In *State v. Keith*, 283 S.C. 597, 325 S.E.2d 325 (1985), this Court held that when a defendant commits robbery without a deadly weapon, but becomes armed with a deadly weapon before asportation of the victim's property, a conviction for armed robbery will stand. Here, in light of the fact that the Victim was stabbed some 75 times, it is inescapable that the perpetrator became armed prior to asportation of his property. Accordingly, any error resultant from the charge is harmless beyond a reasonable doubt, as the jury would necessarily have found armed robbery from the use of the Phillips head screwdriver. *Arnold v. State*, 309 S.C. 157, 420 S.E.2d 834 (1992), *cert. denied*, 507 U.S. 927, 113 S.Ct. 1302, 122 L.Ed.2d 691 (1993) (error is harmless beyond a reasonable doubt where it did not contribute to the verdict obtained).

## 5. *CORPUS DELICTI* OF KIDNAPING

██ Bennett next asserts error in the denial of his motion for a directed verdict on the kidnaping charge as the state

---

weapon by the jury, and yet a hand or fist, in circumstances in which it may inflict great bodily injury or death, may not. *See State v. Tasco*, 292 S.C. 270, 356 S.E.2d 117 (1987).

failed to prove the *corpus delicti* of the crime independent of his statement. We disagree.

The *corpus delicti* of kidnaping may be proved by circumstantial evidence. *State v. Davis,* 309 S.C. 326, 422 S.E.2d 133 (1992); *State v. Owens,* 291 S.C. 116, 352 S.E.2d 474, *cert. denied,* 484 U.S. 982, 108 S.Ct. 496, 98 L.Ed.2d 495 (1987). Kidnaping is a continuing offense. The offense commences when one is wrongfully deprived of freedom and continues until freedom is restored. *State v. Hall,* 280 S.C. 74, 310 S.E.2d 429 (1983) (*citing State v. Ziegler,* 274 S.C. 6, 10, 260 S.E.2d 182, 184 (1979)).

Here, the only **direct** evidence Victim was seized, confined, or carried away came from Bennett's own statement that he had knocked Victim unconscious then put him in the car and drove him to the ballfield in Swansea.[7] However, the pathologist testified that one of the blows to the chin may have rendered Victim unconscious. Additionally, the Victim had numerous defensive wounds on his hands, and his body was found in a remote location buried in the woods behind Bennett's sister's house. Further, Victim's automobile was found parked in a school parking lot where Bennett's mother worked, some distance from the body. Moreover, there was testimony that Victim was very possessive of his automobile and did not allow others to drive it. Although circumstantial, a jury could have inferred from this evidence that either Victim was forcibly taken to the woods, or that he was, at some point, confined (as is evidenced by the defensive wounds), and later taken to the woods. Accordingly, we find it is sufficient circumstantial evidence to warrant submission of the kidnaping charge to the jury. *State v. Butler,* 277 S.C. 452, 290 S.E.2d 1, *cert. denied,* 459 U.S. 932, 103 S.Ct. 242, 74 L.Ed.2d 191 (1982) (aggravating circumstance is properly submitted to jury if supported by any direct or circumstantial evidence); *cf. State v. Copeland,* 321 S.C. 318, 468 S.E.2d 620 (1996) (circumstantial evidence of manner of victim's disappearance, coupled with victim's unlikely voluntary departure

---

7. Bennett does not contest the sufficiency of this evidence to prove kidnaping; he merely claims his statement is not corroborated by any other evidence.

as evidence by his personal habits and relationships, sufficient to establish *corpus delicti* of murder).

### 6. TORTURE

Bennett next asserts the aggravating circumstance of torture was improperly submitted to the jury. We disagree.

In determining whether to submit an aggravating circumstance to the jury, the trial court is concerned only with the existence of evidence, not its weight. *State v. Smith,* 298 S.C. 482, 381 S.E.2d 724 (1989), *cert. denied* 494 U.S. 1060, 110 S.Ct. 1536, 108 L.Ed.2d 775 (1990). The aggravating circumstance is properly submitted if supported by any direct or circumstantial evidence. *State v. Butler, supra.*

In *State v. Elmore,* 279 S.C. 417, 308 S.E.2d 781 (1983), *overruled in part on other grounds, State v. Torrence, supra,* this Court held that physical torture occurs when a person is subject to "serious physical abuse" and "aggravated battery." *See also State v. Smith,* 298 S.C. 482, 381 S.E.2d 724 (1989), cert. denied, 494 U.S. 1060, 110 S.Ct. 1536, 108 L.Ed.2d 775 (1990) (physical torture occurs when the victim is intentionally subjected to serious physical abuse prior to death). Here, the evidence adduced during the guilt and sentencing phases revealed that Victim had been stabbed in the head, back and neck some 70–75 times with a Phillips head screwdriver. The defensive wounds tended to indicate Victim was conscious at least through a portion of the attack, and there was testimony that most of the wounds were inflicted before death. Dr. Sexton testified that Victim could have lived between 3–15 minutes after the stab wounds were inflicted. This is clearly sufficient evidence from which the jury could have found Victim was intentionally subjected to serious physical abuse prior to death.

Contrary to Bennett's assertion, the mere fact that the state's pathologist testified this was not a "typical" case of torture is simply not dispositive of the issue; the pathologist specifically testified that the multiple injuries here could "in a sense" be interpreted as torture and that each of the superficial wounds would have been painful. Further, although he testified that the individual inflicting the wounds likely did not intend for the wounds to constitute torture, they may have

been interpreted that way by Victim. We find the aggravating circumstance of torture was properly submitted to the jury.

## 7. RELIGIOUS ARGUMENT TO JURY

During his *pro se* statement to the sentencing jury, Bennett stated:

BENNETT: Like I said, I've changed and I'm not going go sit here and try to persuade you one way or the other in the ways I have changed because that's between me and God and I'm not afraid to die. Never was and never will be because I know when I do leave here, its not going to be man passing the judgment on me. It's going to be my God the Almighty creditor [sic] Himself and God says vengeance is mine—

SOLICITOR: Objection. He's going outside the evidence now, Your Honor.

COURT: Stay within the record, Mr. Bennett.

BENNETT: But like I say, either way it goes, whatever you decide, I can adapt. . . . I have adapted for five years and one day this all is going to be over. It's all going to be behind me and the judgment that you pass upon me now it's going to be reversed. I mean, I'm not threatening you. It's something that I believe in because I know that my God is for me and no man can be against me and one day me and my family—oh yeah, we will walk out of here again hand-in-hand.

Bennett contends he was deprived of the right to make a religious argument to the jury. We disagree.

The record clearly demonstrates that Bennett did, in fact, make his religious argument to the jury. Accordingly, he has failed to demonstrate any prejudice from the trial court's ruling. *State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991) (no prejudice resultant from trial court's ruling where witness is able to make point before the jury); *State v. McDowell*, 266 S.C. 508, 224 S.E.2d 889 (1976) (trial court's limitation of argument to jury did not deprive defendant's ability to make point).[8]

---

8. Since Bennett was able to make his religious point, we need not address whether such argument would, in fact, be permissible before

## 8. PERSONNEL RECORDS

At sentencing, Bennett sought disclosure of the personnel records of a number of guards from the Lexington County Detention Center on the theory they may have contained information with which he could have impeached certain witness. The trial court ordered portions of the records disclosed, but declined to release the remainder of the records, ordering them sealed for this Court's review.

We have thoroughly reviewed the records sealed to this Court. Our review reveals no relevant evidence which Bennett could have used for impeachment purposes. Accordingly, the trial court committed no error in refusing disclosure of these files.

Bennett's remaining issues are affirmed pursuant to Rule 220(b)(1), SCACR and the following authorities: Bennett's Issue 8: *State v. Kornahrens*, 290 S.C. 281, 350 S.E.2d 180 (1986) *cert. denied* 480 U.S. 940, 107 S.Ct. 1592, 94 L.Ed.2d 781 (1987); *State v. Franklin*, 318 S.C. 47, 456 S.E.2d 357, *cert. denied* —— U.S. ——, 116 S.Ct. 160, 133 L.Ed.2d 103 (1995); *State v. Williams*, 321 S.C. 327, 468 S.E.2d 626, *cert. denied*, —— U.S. ——, 117 S.Ct. 230, 136 L.Ed.2d 161 (1996); Bennett's Issue 10: *State v. Byram*, 326 S.C. 107, 485 S.E.2d 360 (1997); *State v. Whipple*, 324 S.C. 43, 476 S.E.2d 683, *cert. denied* —— U.S. ——, 117 S.Ct. 618, 136 L.Ed.2d 541 (1996); *State v. Young*, 319 S.C. 33, 459 S.E.2d 84 (1995), *cert. denied* —— U.S. ——, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996); Bennett's Issue 12: *Bozeman v. State*, 307 S.C. 172, 414 S.E.2d 144 (1992); *see also State v. Motley*, 251 S.C. 568, 164 S.E.2d 569 (1968).

## CONCLUSION

We affirm Bennett's convictions and the sentences imposed for armed robbery and larceny. The sentence of death is reversed and remanded for a new sentencing proceeding.

---

the jury. *But see generally Bennett v. Angelone*, 92 F.3d 1336 (4th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 503, 136 L.Ed.2d 395 (1996) (recognizing federal and state courts which have condemned such arguments).

AFFIRMED IN PART; REVERSED IN PART AND
REMANDED FOR RESENTENCING.

TOAL, MOORE, BURNETT, JJ., and GEORGE T.
GREGORY, JR., Acting Associate Justice, concur.