649 S.E.2d 132

**The STATE, Respondent,**

v.

**Terry Bernard DAVIS, Appellant.**

**No. 4267.**

Court of Appeals of South Carolina.

Submitted April 2, 2007.

Decided June 28, 2007.

Rehearing Denied Aug. 27, 2007.

Chief Attorney Joseph L. Savitz, III, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Norman Mark Rapoport, all of Columbia; and Solicitor Edgar Lewis Clements, III, of Florence, for Respondent.

GOOLSBY, J.

Terry Bernard Davis ("Davis") appeals his conviction for voluntary manslaughter. Davis argues that the trial judge erred in declining to charge the jury on involuntary manslaughter. We affirm.[1]

## FACTS

Davis, along with his cousin Robert Britton, lived in the home of his brother, Christopher Davis ("Christopher"). Davis, a crack cocaine user, allowed Kevin Harrison and Shontae Broaddus to sell crack cocaine out of Christopher's home in exchange for some of their crack cocaine.[2] Davis also acted as a sort of middleman for Harrison and Broaddus, bringing customers to the dealers in exchange for a portion of the crack cocaine being sold. Davis allowed Bridgette Martin, a fellow crack cocaine user, to live in the home.[3]

Before leaving for work on the morning of October 1, 2003, Christopher told Davis that Harrison and Broaddus could no longer stay in the house and that Davis would have to ask them to leave. Broaddus overheard Christopher's request and, realizing he was no longer welcome, decided to leave. Broaddus commented to Harrison that he should leave too; however, Harrison ignored him and returned to a recliner he had been sleeping in earlier.

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

2. Harrison is also referred to by his alias "Little K" throughout the record.

3. Martin testified she only stayed at the home during the daytime.

Davis, in a statement to the police, claimed he asked Harrison to leave the residence. By this time, Christopher, Broaddus, and Britton had already left the house. Harrison supposedly pulled out his handgun, put it to Davis's head, and told Davis to leave him alone. Harrison reportedly said he had given Davis enough crack cocaine to entitle him to remain in the home until 10 a.m. Davis returned shortly thereafter with Britton's five-pound sledgehammer, wrapped a towel around the head of it, and hit Harrison twice in the head with it. Harrison was seated in the recliner when Davis struck him with the sledgehammer. The first blow supposedly stunned Harrison, but Davis claimed he needed to hit Harrison again to prevent Harrison from using his gun. Davis then enlisted Martin's help, the only other person in the house at that time, and the two of them dragged Harrison's body outside. Davis repeated this version of events to Christopher and Britton, although in Britton's version Davis claimed he only intended to knock Harrison out and remove him from the home.

Martin testified she did not hear Davis and Harrison argue that day. Before Harrison was killed, Davis told her, "I'm gone [sic] kill that b* * *h." Martin initially ignored the statement, but Davis returned later and said, while dragging Harrison's body past the bedroom door, that he "kill[ed] that b* * *h." Davis was holding a sledgehammer with the hammer part wrapped in a towel as he dragged Harrison's body. Martin testified Davis had threatened other dealers in the past, often with a variation of the phrase "[I will] [k]ill you and smoke your s* *t like a chimney"; however, the threats were never taken seriously. Martin admitted she smoked crack cocaine and consumed alcohol on the morning that Harrison was killed.

Davis traded Harrison's gun and cell phone for $40 in crack cocaine. Martin also claims that Davis took Harrison's supply of crack cocaine and offered to share with her. A neighbor discovered Harrison's body, wrapped in a carpet, situated between his yard and Christopher Davis's property.

An autopsy of Harrison revealed an injury to his skull, caused by a significant blow to the side of Harrison's head, which produced a fracture at the base of Harrison's skull from ear to ear. The forensic pathologist who conducted the autop-

sy, Dr. Janice Ross, opined that Harrison's injury was consistent with one or two blows from a sledgehammer that he received while seated. Her examination of Harrison did not reveal any defensive wounds.[4]

Davis was indicted for murder. Davis's counsel requested jury instructions on involuntary manslaughter and self-defense. The State objected to the involuntary manslaughter charge and the trial court declined to charge the jury on involuntary manslaughter. The jury found Davis guilty of voluntary manslaughter, and the trial court sentenced him to thirty years imprisonment.

## STANDARD OF REVIEW

"The law to be charged must be determined from the evidence presented at trial."[5] "To warrant reversal, a trial court's refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant."[6] "Due process requires that a lesser included offense be charged when the evidence warrants it but only if the evidence would permit a jury rationally to find the defendant guilty of the lesser offense."[7]

## LAW/ANALYSIS

Davis argues the trial judge erred by declining to instruct the jury on the lesser included offense of involuntary manslaughter.

Involuntary manslaughter is defined as "the killing of another without malice and unintentionally while engaged in either: (1) an unlawful act not amounting to a felony and not naturally tending to cause death or great bodily harm; or (2) a

4. Dr. Ross testified that defensive wounds are wounds incurred by the victim while trying to defend from an attacker. These injuries are usually in the form of bruises or lacerations on the outside of the arms or hands.

5. *State v. Patterson*, 367 S.C. 219, 231, 625 S.E.2d 239, 245 (Ct.App. 2006).

6. *Id.* at 232, 625 S.E.2d at 245 (Ct.App.2006).

7. *State v. Small*, 307 S.C. 92, 94, 413 S.E.2d 870, 871 (Ct.App.1992).

lawful act with reckless disregard for the safety of others." [8] "To constitute involuntary manslaughter, there must be a finding of criminal negligence, statutorily defined as a reckless disregard of the safety of others." [9]

Davis relies on *State v. Chatman* for the proposition that an intentional act causing death does not necessarily preclude involuntary manslaughter.[10] We believe *Chatman* is distinguishable from the case at hand. Chatman was engaged in an assault and battery with the victim, during which Chatman, while facing the victim, pressed his shoulder into the victim's neck.[11] Although Chatman released the victim shortly thereafter, the victim "died as a result of asphyxiation due to manual strangulation." [12] Chatman's actions did not fit the typical strangulation type situation because he did not place his hands around the victim's neck.[13] As a result, the court concluded Chatman was entitled to a charge on involuntary manslaughter because his actions were not the kind that would naturally tend to cause serious bodily injury or death.[14] We think the facts in this case do not fit the first definition of involuntary manslaughter, as the court used in deciding *Chatman*, because striking someone on the side of the head with a five-pound sledgehammer would naturally tend to cause death or great bodily injury.[15]

---

8. *State v. Reese*, 370 S.C. 31, 36, 633 S.E.2d 898, 900 (2006).

9. *State v. Crosby*, 355 S.C. 47, 52, 584 S.E.2d 110, 112 (2003).

10. *State v. Chatman*, 336 S.C. 149, 519 S.E.2d 100 (1999).

11. *Id.* at 152–53, 519 S.E.2d at 101–02.

12. *Id.* at 152, 519 S.E.2d at 101.

13. *Id.* at 153, 519 S.E.2d at 101–02.

14. *Id.* at 152–53, 519 S.E.2d at 101–02.

15. We note that Davis may have wrapped the head of the sledgehammer in a towel. There is no evidence, however, that this lessened the tendency of a five-pound sledgehammer to cause death or great bodily injury if used to strike someone in the head. *See State v. Bennett*, 328 S.C. 251, 262, 493 S.E.2d 845, 850–51 (1997) ("A deadly weapon is generally defined as any article, instrument or substance which is likely to produce death or great bodily harm."); *Commonwealth v. Marks*, 704 A.2d 1095, 1100 (Pa.Super.1997) (categorizing a sledgehammer as a

Davis also argues the facts of this case fit the second definition of involuntary manslaughter. He contends he acted lawfully by arming himself in self-defense to drive out an armed trespasser. Davis fails to meet the second definition of involuntary manslaughter because there is no evidence he handled the sledgehammer with reckless disregard for the safety of others. The evidence firmly establishes that Davis intentionally struck Harrison on the head with the sledgehammer.[16]

Based on the above, we hold the trial court did not commit error in denying Davis's request for a jury charge on involuntary manslaughter.

**AFFIRMED.**

HEARN, C.J., and STILWELL, J., concur.

---

deadly weapon when used upon a vital part of the body such as the head).

16. *See State v. Smith*, 315 S.C. 547, 550, 446 S.E.2d 411, 413 (1994) (holding "the intentional use of a dangerous instrumentality does not support the allegation of mere criminal negligence."); *State v. Morris*, 307 S.C. 480, 484, 415 S.E.2d 819, 821–22 (Ct.App.1991) (holding the defendant was not entitled to a charge of involuntary manslaughter where there was no evidence that he involuntarily pulled his gun and shot the victim, noting the act must be unintentional to constitute criminal negligence); *State v. Craig*, 267 S.C. 262, 269, 227 S.E.2d 306, 310 (1976) (finding involuntary manslaughter charge not warranted by the evidence where the defendant intentionally fired his shotgun but claimed he meant to shoot over the victim's head); *Bozeman v. State*, 307 S.C. 172, 177, 414 S.E.2d 144, 147 (1992) (finding no evidence to support an allegation of mere criminal negligence in the use of a dangerous instrumentality because the defendant intentionally fired his weapon); *State v. Light*, 363 S.C. 325, 331 n. 1, 610 S.E.2d 504, 507 n. 1 (Ct.App.2005) (noting that evidence tending to show the intentional use of a weapon would not support an involuntary manslaughter charge).