599 S.E.2d 448

**The STATE, Respondent,**

v.

**Kenneth SIMMONS, Appellant.**

**No. 25838.**

Supreme Court of South Carolina.

Heard April 6, 2004.

Decided June 14, 2004.

Rehearing Denied Aug. 9, 2004.

Assistant Appellate Defenders Robert M. Dudek and Eleanor Duffy Cleary, of South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, and Assistant Deputy Attorney General Donald J. Zelenka, of Columbia; and Solicitor Walter M. Bailey, of Summerville, for respondent.

Acting Justice KITTREDGE:

Kenneth Simmons was convicted of murder, first degree burglary, armed robbery, and first degree criminal sexual conduct. He was sentenced to death and given consecutive sentences of life and two thirty-year terms on the remaining

charges. We reverse the conviction and sentence for armed robbery, but otherwise affirm Simmons' convictions and sentences.

## FACTS

On September 1, 1996, the battered body of an eighty-nine-year-old female, whom we will refer to as Ms. B,[1] was found bound and gagged on the kitchen floor of her home in Summerville. She had been raped, severely beaten, and strangled.

The crime went unsolved for more than a year until December 1997 when Simmons, who was incarcerated on other charges, confessed to the killing. He said he smoked crack and drank beer at a club before riding his bicycle home in the early morning hours on the day of the murder. Simmons saw Ms. B in her yard feeding her chickens and followed her into her house. Simmons pushed her and demanded money. Ms. B fell to the floor and hit her head. Simmons then hit her with a stick he had picked up on the back porch. He described the stick as being about two feet long and an inch and a half or two inches in diameter. Simmons raped Ms. B. She was "half and half" alive when he fled the scene.

The State's pathologist testified Ms. B died from blunt trauma and manual strangulation. She had multiple rib fractures caused by stomping or slamming, severe head trauma, and severe vaginal lacerations from the insertion of an object such as a stick or finger. She had semen in her vagina and also in her mouth. DNA testing indicated the semen taken from Ms. B's body was consistent with Simmons' DNA.

The jury found aggravating circumstances of criminal sexual conduct, kidnapping, armed robbery, physical torture, and burglary, and sentenced Simmons to death.

## ISSUES

1. Did the State violate *Doyle v. Ohio?*

2. Was a juror improperly dismissed after the trial had begun?

---

1. We elect not to identify the victim by name.

3. Did the trial judge err in refusing to charge robbery as a lesser-included offense of armed robbery?

4. Was rebuttal evidence improperly excluded in the penalty phase?

## DISCUSSION

### 1. Doyle v. Ohio

■ Because the State's case rested largely on Simmons' confession, the defense strategy during the guilt phase was to introduce expert testimony that Simmons was not mentally capable of understanding and waiving his *Miranda*[2] rights.

Dr. Jeffrey Vidic, a psychologist at the William S. Hall Institute,[3] along with Dr. Thomas Behrman, a psychiatrist also employed at the Hall Institute, attempted to evaluate Simmons for competency on November 23, 1998. Drs. Vidic and Behrman testified as defense witnesses. Dr. Vidic was not satisfied Simmons possessed the ability to comprehend his *Miranda* warnings and therefore the competency exam could not proceed as planned. Dr. Vidic stated he could not formulate an opinion to a reasonable degree of certainty whether Simmons actually understood his rights or whether he was "malingering an inability to understand his rights." Dr. Behrman's testimony lent further support to Simmons' position, for he stated, based on his November 23 observations, that Simmons was not "able to explain his rights . . . in a sufficient or meaningful fashion." Dr. Behrman specifically opined that on November 23 Simmons "lacked the ability to waive his rights for the purpose of the evaluation."

On cross-examination, Dr. Vidic testified over Simmons' objection that immediately after the aborted November 23 competency exam, he left a note for his intern, Ms. Skaggs, asking her to administer psychological tests to Simmons during a lunch break. The psychological testing requested by Dr. Vidic did not involve the facts of the case. Simmons refused

---

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. The William S. Hall Institute is the primary educational and research facility for the South Carolina Department of Mental Health.

to cooperate with the testing administered by Ms. Skaggs, invoking his "right" to speak with his lawyer. The State elicited this testimony in response to Simmons' position that he lacked the ability to understand and exercise the *Miranda* warnings and rights.

On appeal, Simmons argues the trial court erred in allowing the prosecutor's cross-examination in violation of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and *Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). We disagree.

*Doyle* holds that the Due Process Clause prohibits the government from commenting on an accused's post-*Miranda* silence. *Doyle* rests on "the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." *South Dakota v. Neville,* 459 U.S. 553, 565, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983). This same concept of fundamental unfairness prohibits the government from using a defendant's post-*Miranda* silence as proof of sanity to overcome an insanity defense. *Wainwright v. Greenfield, supra; see also State v. Smith,* 290 S.C. 393, 350 S.E.2d 923 (1986).

*Doyle* does not, however, create a per se rule requiring exclusion from evidence of a defendant's post-arrest, post-*Miranda* silence in all circumstances. As the *Doyle* court recognized:

> It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest.

*Id.* at 619, n. 11, 96 S.Ct. 2240.

In *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), the Court further clarified *Doyle:*

> *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such question-

ing makes no unfair use of silence because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.

447 U.S. at 408, 100 S.Ct. 2180. Other courts have found the Supreme Court's holding in *Charles* is not limited to situations involving inconsistent statements. *See Splunge v. Parke*, 160 F.3d 369 (7th Cir.1998) (initial silence used to show police scrupulously honored defendant's rights); *Allen v. State*, 686 N.E.2d 760 (Ind.1997) (refusal to give written statement after oral statement used to show rights respected); *Commonwealth v. Waite*, 422 Mass. 792, 665 N.E.2d 982 (1996) (reassertion of silence used to show context in which questioning ended); *State v. Correia*, 707 A.2d 1245 (R.I.1998) (same).

The underpinnings of *Doyle*, and the need for its application, are diminished where a defendant waives his right to silence. Here, Simmons did not remain silent "as to the subject matter of his statements." Simmons, following a waiver of his *Miranda* rights, confessed to the murder of Ms. B in December 1997. Following the lone invocation of his right to remain silent in the context of the November 23, 1998, competency evaluation, Simmons again waived his *Miranda* rights and cooperated with a January 1999 evaluation. In this regard, in response to the defense strategy centered on Simmons' purported inability to comprehend the *Miranda* warnings, the State's targeted and narrow use of Simmons' recognition and exercise of his "right" to speak with counsel did not breach the implied assurance contained in *Miranda*. Simmons asserted his right to silence only in the context of the November 23 psychological examination. The limited evidence of Simmons' silence in this context was not "designed to draw meaning from silence" regarding the substantive crime and therefore does not violate *Doyle*. *Charles*, 447 U.S. at 409, 100 S.Ct. 2180.

This case is distinguishable from *Greenfield*. In *Greenfield* the evidence of the defendant's silence was used as substantive evidence of guilt in the prosecution's case-in-chief because the defendant pled not guilty by reason of insanity. Here, the evidence of Simmons' silence was not offered as substantive evidence of guilt but as evidence of malingering to rebut his

claim that he was incapable of understanding his *Miranda* rights.

We thus conclude the State's use of evidence of Simmons' silence did not violate the fundamental fairness standard of *Doyle.*

### 2. Dismissal of juror

■ After jury selection, the trial judge informed the jury about sequestration and repeatedly admonished the jury not to discuss the case with anyone. Contact by jurors with family members, by telephone or otherwise, was to be monitored by the SLED team in charge of security and sequestration.

Before the end of the guilt phase, information regarding Juror C was brought to the court's attention. The trial judge noted for the record:

Captain Polk of SLED received a call from the wife of [Juror C] at which time the lady revealed to him that she was very concerned because she realized that the sister of the defendant, Kenneth Simmons, lived across the street from a piece of property that they owned on Congress Street in the Town of Summerville. And in the event that the jury returned a verdict of guilty or imposed the death penalty and they were going to build on a vacant lot across the street from the defendant's sister that it would perhaps cause consternation, fear, concern, or whatever.

The trial judge asked Captain Polk to call Juror C's wife but Captain Polk was unable to immediately contact her.

Meanwhile, the trial judge received a note from Juror C stating:

Your honor, I have realized that I know a possible relative of the defendant, Kenneth Simmons, and asked earlier in the week if I knew relatives of the accused, I truthfully answered no. After the trial started, I saw a woman I recognized sitting behind Kenneth Simmons. I now realize the woman in the audience was, I believe, a Mrs. Louise that lives opposite a vacant lot I own in the Town of Summerville on Congress Street. In the future my wife and I intend to build on this lot our primary residence. I have upon occasion been cordial with Mrs. Louise and say

hello to her while I am on or about my property. Knowing Mrs. Louise will not influence my decision-making ability regarding the guilt or innocence of Kenneth Simmons. If the trial proceeds to the penalty stage, none of the above will influence my decision-making ability regarding life imprisonment or the death penalty as outlined in the pre-trial questionnaire. I felt it was my duty as a juror to inform you of the above and to continue to serve you in any capacity you see fit.

Captain Polk then spoke with Juror C's wife. She told Captain Polk she had talked with her husband about Simmons' sister and stated she was upset, fearful, and "really concerned." Although Juror C's note was written after the improper conversation, the note contained no reference to the conversation.

The State then moved to excuse Juror C. Simmons requested that the trial judge first question Juror C. about the conversation with his wife. The trial judge questioned Juror C in chambers. Juror C confirmed that he and his wife had discussed the personal effect of a verdict in the case. The trial judge explained to Juror C that because he and his wife had discussed the case, he would be excused from the case. As a result of the "improper communication" between Juror C and his wife, Juror C was excused.

On appeal, Simmons contends the trial court erred in dismissing Juror C since the juror indicated he could maintain his impartiality. We disagree. Simmons cites *Greer v. Norvill,* 21 S.C.L. (3 Hill) 262 (1837), for the proposition that once the jury has been sworn, the trial court cannot discharge a qualified juror without legal cause absent the consent of both parties. In *Greer,* a juror was removed after being seated solely on the basis of counsel's assertion that the juror was biased against counsel and would not do his client justice. There was no evidence to support counsel's bald assertion, and our court of appeals found the excusal of the juror arbitrary.

The court of appeals distinguished *Greer* in the case of *Boland v. Greenville and Columbia R.R. Co.,* 46 S.C.L. (12 Rich.) 368 (1859), wherein a juror, who was the local coroner, was dismissed during trial because he was needed to investigate a homicide. The court noted it is within the trial court's

discretion to substitute an alternate juror where there is a legal necessity or there is disclosed during trial a disqualifying interest of a juryman. *Id.*

In this case, the record indicates Juror C discussed the case with his wife, including the personal effect of a possible verdict, against the trial judge's express admonition not to do so. We hold the trial judge acted within his discretion in excusing Juror C for the juror's unauthorized communication with his wife.[4]

### 3. Robbery as a lesser-included offense

■ Upon the State's objection, the trial court refused Simmons' request to charge robbery as a lesser-included offense of armed robbery ruling that "[w]hile it's a true proposition of law ... it's not applicable to the uncontradicted facts." Simmons contends this was error because the evidence indicates the only weapons involved were fists and a stick, and whether either of these qualifies as a "deadly weapon" is a question of fact for the jury. The State argues that since the victim died as a result of wounds inflicted by fists or a stick, these are "deadly weapons" as a matter of law.

■ South Carolina Code Ann. § 16–11–330(A) (Supp.2003) defines armed robbery in pertinent part as "robbery while armed with a pistol, dirk, slingshot, metal knuckles, razor, *or other deadly weapon.*" (emphasis added). Whether an object has been used as a deadly weapon depends upon the facts and circumstances of each case. *State v. Davis,* 309 S.C. 326, 422 S.E.2d 133 (1992) (murder);[5] *see also State v. Bennett,* 328 S.C. 251, 493 S.E.2d 845 (1997) (fist may be deadly weapon for purposes of armed robbery). Despite the egregious facts of this case, we adhere to the rule in *Davis* and hold that

---

4. We emphasize this is not a case where a juror was removed for concealing information during voir dire. This juror's self-proclaimed impartiality is therefore not dispositive. *Cf. State v. Stone,* 350 S.C. 442, 567 S.E.2d 244 (2002) (error to remove juror for innocently concealing information where juror indicated her impartiality was not affected).

5. *Overruled on other grounds by Brightman v. State,* 336 S.C. 348, 520 S.E.2d 614 (1999) (failure to give *King* charge not reversible error).

whether the robbery was perpetrated with a deadly weapon was a question of fact for the jury.

Although the trial court charged the jury that it was to determine whether a deadly weapon was used, the court refused to give the jury the option of convicting Simmons of the lesser offense of robbery. This was error. We therefore reverse Simmons' conviction and sentence for armed robbery. *See Brightman v. State*, 336 S.C. 348, 520 S.E.2d 614 (1999) (trial judge must charge lesser-included offense if there is any evidence from which it can be inferred the defendant committed lesser rather than greater offense).

▆ The real impetus in Simmons' challenge to the failure to charge the lesser-included offense is to invalidate the jury's finding of armed robbery as an aggravating factor, and ultimately, invalidate the sentence of death. While we agree that the error requires us to vacate the invalid aggravator of armed robbery, the error does not warrant reversal of the death sentence. Succinctly stated, we find Simmons' death sentence is supported by other valid aggravators.

▆ In *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the Supreme Court held that in states such as ours where aggravating and mitigating factors are not weighed "pursuant to any special standard," a death sentence may be upheld even where one aggravator has been invalidated if there is a valid aggravator remaining.[6] As the Court

---

6. *Zant* involved Georgia's death penalty statute. Georgia's statutory approach requires the factfinder to consider applicable aggravating and mitigating circumstances, without regard to "any special standard." *Id.* at 873, 103 S.Ct. 2733. In weighing "aggravating and mitigating circumstances against each other," the Georgia statutory scheme is not "governed by any specific standards." *Id.* at 875, 103 S.Ct. 2733. Under Georgia law, the factfinder retains "absolute discretion" to impose a life sentence, notwithstanding the presence of an aggravating circumstance. *Id.* at 871, 103 S.Ct. 2733. South Carolina's statutory scheme is in accord, and we find the reasoning of *Zant* persuasive. *See* S.C.Code Ann. § 16–3–20(B) (2003) (if statutory aggravating circumstance found, defendant sentenced to either death or life imprisonment); *State v. Hughey*, 339 S.C. 439, 529 S.E.2d 721 (2000) (jury may recommend life imprisonment for any reason or no reason at all); *State v. Elkins*, 312 S.C. 541, 436 S.E.2d 178 (1993) (under our capital sentencing scheme, jury does not "weigh" aggravating circumstances; the failure of one aggravating circumstance does not require reversal where there remains a valid aggravator).

later explained in *Tuggle v. Netherland,* 516 U.S. 10, 13, 116 S.Ct. 283, 133 L.Ed.2d 251 (1995), *Zant* was "predicated on the fact that even after elimination of the invalid aggravator, the death sentence rested on firm ground." To the contrary, in *Tuggle,* an aggravator was invalidated because the defendant was precluded from developing rebuttal evidence relevant in the penalty phase. The Court concluded the evidentiary error could have affected the jury's consideration of the death sentence even though another aggravator was found. We are confronted with no such evidentiary preclusion.

Here, the jury affirmatively found independent aggravators of criminal sexual conduct, kidnapping, burglary, and physical torture, in addition to armed robbery. There was no error in the admission or exclusion of evidence in the penalty phase. We conclude the invalidation of the armed robbery aggravator does not impact the validity of the other aggravators found by the jury in this case, and we reject Simmons' challenge to his death sentence.

### 4. Rebuttal evidence in penalty phase

 In the penalty phase, the State presented victim impact evidence from the victim's family and friends stating how they were negatively affected by the victim's death. During the defense case, Simmons' cousin, Calvin Linning, testified about positive features of Simmons' character. Linning then stated:

> It's awfully hard for me to be up here today because I'm certainly nervous because we know [the victim] personally. I grew up in the Church of God in Summerville and [the victim] and my family was real close. We would take her to the State Youth Convention year after year. My brother is the one that taught her how to drive. And my niece was really close to [the victim]. She had a real close relationship with her. And it was real painful when we discovered about her—

At this point, the State objected to Linning's testimony regarding "his personal feelings about what occurred." The objection was sustained. Linning finished his testimony by asking the jury to give Simmons a life sentence rather than death.

Simmons contends it was a due process violation for the trial court to disallow Linning's testimony that Simmons' family suffered because of the victim's death. We disagree.

First, this argument was not raised at trial and no proffer was made as to what Linning's testimony would have been had he been allowed to continue. This issue therefore is not preserved for review. *State v. Hughes*, 336 S.C. 585, 521 S.E.2d 500 (1999) (to be preserved for appellate review, issue must be raised and ruled upon in the trial court). In any event, there was no error.

In *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Supreme Court ruled victim impact evidence is admissible to show the victim's uniqueness as an individual human being and the specific harm committed by the defendant in murdering the victim. This evidence is relevant for the jury to meaningfully assess the defendant's moral culpability and blameworthiness. *State v. Byram*, 326 S.C. 107, 485 S.E.2d 360 (1997). Here, the impact of the victim's death on Simmons' family is not relevant rebuttal to the evidence of Simmons' moral culpability shown by the victim impact testimony. We find no due process violation.

## CONCLUSION

Pursuant to S.C.Code Ann. § 16-3-25(C)(2003), we find the death sentence in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor; the evidence supports the jury's findings of aggravating circumstances; and the sentence of death is neither excessive nor disproportionate to the penalty imposed in. similar cases. *See State v. Terry*, 339 S.C. 352, 529 S.E.2d 274 (2000); *State v. Conyers*, 326 S.C. 263, 487 S.E.2d 181 (1997); *State v. Whipple*, 324 S.C. 43, 476 S.E.2d 683 (1996). We reverse Simmons' conviction and sentence for armed robbery and affirm his remaining convictions and sentences.

**AFFIRMED IN PART; REVERSED IN PART.**

TOAL, C.J., WALLER, BURNETT and PLEICONES, JJ., concur.