716 S.E.2d 895

The STATE, Respondent,

v.

William O. DICKERSON, Appellant.

No. 27048.

Supreme Court of South Carolina.

Heard May 24, 2011.
Decided Oct. 3, 2011.
Rehearing Denied Nov. 17, 2011.

Chief Appellate Defender Robert M. Dudek, and Appellate Defender Kathrine H. Hudgins, South Carolina Commission on Indigent Defense, of Columbia, and Jeffrey P. Bloom, of Columbia, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Senior Assistant Attorney General Melody J. Brown, Office of the Attorney General, of Columbia, and Solicitor Scarlett Anne Wilson, of Charleston, for Respondent.

Justice HEARN.

A jury convicted William Dickerson of first degree murder, kidnapping, and criminal sexual conduct, and he was sentenced to death. Dickerson now appeals his sentence pursuant to Section 16–3–25(A) of the South Carolina Code (2003). He argues the circuit court erred: (1) in not excusing a juror for cause; (2) in limiting the cross-examination of the pathologist called by the State; (3) in not charging the jury on the

law of accessory after the fact; and (4) in limiting the testimony of Dickerson's cousin during the penalty phase of his trial. We affirm and further find that Dickerson's sentence is proportional, supported by the evidence, and not the result of passion, prejudice, or any other arbitrary factor.

## FACTUAL/PROCEDURAL BACKGROUND

Dickerson and Gerard Roper had been friends, even best friends, since childhood. On the morning of March 6, 2006, Roper went to his friend, Ben Drayton's, house to play video games. Around the same time, Dickerson went to his friend, Antonio Nelson's, house asking for a ride to his brother, Armon Dickerson's, house. Nelson was unable to give Dickerson a ride at that time and told him to come back later. When Dickerson returned later that afternoon, he was carrying a gun.

En route to Armon's house, however, Dickerson began calling Roper from his cell phone. After receiving no answer, Dickerson asked if they could make a stop at Drayton's house so he could "get some money." When they arrived at Drayton's home, Dickerson entered brandishing his weapon and asking for money. Roper told Dickerson "I got your money," begging "don't shoot me" and "please don't kill me." Dickerson nevertheless fired a shot at Roper but missed. He then struck Roper in the head with the gun, dragged him out of the house, and forced him into Nelson's car. Dickerson then took Roper to Armon's house.[1]

Armon and Dickerson brought Roper inside and systematically tortured him over approximately thirty-six hours. It started with Dickerson continuing to hit Roper with the gun, knocking out some of his teeth. Armon then left to retrieve Dickerson's car and some drugs, and blood covered the inside of the house when he returned. Dickerson then called another friend of his, Rashid Malik, and threatened him with death if he did not come to Armon's house.[2] When Malik arrived,

---

1. After dropping Dickerson and Roper off, Nelson left and did not return. There is no suggestion he knew of Dickerson's plans beforehand or had any involvement in the subsequent events.

2. Malik attempted to bring Dickerson's mother to Armon's house to calm Dickerson down. When Dickerson learned of this, he threatened

Roper was still conscious but clothed only in his T-shirt, and Armon was attempting to clean up the blood covering the house. Malik then joined Armon and Dickerson.

Although Dickerson, Armon, and Malik all tortured Roper to varying degrees, Dickerson appeared to be the primary actor.[3] Through this entire ordeal, Roper suffered the following at the hands of Dickerson alone: choking, being tied up and placed in a closet, being sodomized with a gun and a broomstick, having his scrotum burned, being hit with a heavy vase and a mirror, and generalized beating and cutting. At one point, Roper began asking that they just let him die.

All told, Roper received over 200 individual wounds to the outside of his body, including lacerations to his anus. He also received several internal injuries, including various broken bones in his face that caused it to appear misshapen, blunt force trauma to his neck resulting in the breaking of various structures, a broken tibia, broken fingers and wrist, brain swelling, and bleeding into the internal structures around his rectum as the result of objects being inserted into it. Although there is no definite timeline of events, Roper survived for eighteen to twenty-four hours after the sodomy occurred, and none of these wounds were inflicted post-mortem. No single wound was fatal. Instead, Roper died from the sum total of his injuries, apparently shortly after he was struck with the mirror and the vase on the morning of March 8.

As these events transpired, Dickerson made several phone calls to various people during which he discussed what he was doing to Roper. Many of them were to Dickerson's girlfriend, and she managed to record one of them containing his description of the sodomy and even Roper's own confirmation of what was happening. Dickerson also confirmed the sodomy, as well as the burning of Roper's scrotum, over the phone to another friend. In a later call to that same friend, he said that Roper

to kill Malik's mother and cut the baby out of Malik's pregnant girlfriend.

3. Armon's girlfriend, Selena Rouse, was in and out of the house during that evening, along with her young son. At some point, Dickerson asked her whether he should let Roper live or die. However, there is no evidence that she actually participated in the torture.

was "gone." However, he told a different friend that Roper was all right but that Dickerson needed to run.

Dickerson and Armon wrapped Roper's semi-clothed body in a blanket and dumped it in the vacant townhouse next to Armon's. Dickerson then changed clothes and fled. Armon and Rouse attempted to clean Armon's house, but they abandoned it upon realizing their efforts would be futile. That same day, a woman who was planning to rent the vacant townhouse entered and discovered Roper's bloodied and mutilated body.

Dickerson was arrested on March 11, 2006, and indicted for murder, kidnapping, and criminal sexual conduct. During voir dire, Juror 370 was the second venireman to be called. He initially identified himself as the type of juror who was able to recommend a sentence of death or life without parole in the appropriate circumstances. The following exchanges then occurred between Juror 370 and the circuit judge:

> Q. I would also instruct you that the only party which has any burden of proof in this proceeding is the State. Mr. Dickerson doesn't have to prove anything, he doesn't have to—he doesn't have to present any evidence, he has no obligation whatsoever. Would you have any problem following that presumption?
>
> A. No sir.
>
> . . . .
>
> Q. ... I would tell you that if the jury were to conclude beyond a reasonable doubt that there were aggravating circumstances, that does not mean that that jury has to return a death sentence, only that it is a potential sentence; do you understand that?
>
> A. Yes, sir.
>
> Q. Because the jury would have the right, notwithstanding the conclusion of aggravating circumstances to find that the appropriate sentence would be life imprisonment without the possibility of parole. I would give you an instruction as to that. You could make that consideration, as well; is that correct?
>
> A. Yes, sir.

When questioned by Dickerson, Juror 370 made the following statements:

Q. Let me just kind of start off with, what is your opinion of the death penalty?

A. I am—I think it needs to be there but there are certain situations that—I mean, I am not too up-to-date on this whole system but I feel like a lot of people get the death penalty when it is not deserved. People die all the time, I mean get put to death, when they're innocent. So—I don't know. It's a big thing.

. . . .

Q. In those types of situations, now that you know what the term "murder" is, not accident, self-defense, manslaughter or insanity, would you always automatically vote for [the death penalty] if the person who did it meant to do it and they had the right person?

. . . .

A. I would still have to hear all of the evidence, everything behind it.

Q. Okay.

A. When, how, where, all that stuff.

Q. Okay. So even if there is no accident, self-defense, manslaughter, insanity, the State has proved it beyond a reasonable doubt, did it, meant to do it and they had the right person; in those cases you're not going to automatically vote for the death penalty?

A. I guess—I guess I would. If it was absolute, then definitely.

Q. When you say "absolutely", you mean—

A. Exactly what you just said, all those.

However, in response to further questioning by Dickerson, Juror 370 stated, "That's why—all those situations, like who he is, like—that kinds of stuff is what I'd want to hear before I just say 'give them the death penalty.'" He then said he would "certainly" listen to mitigating evidence presented by the defense.

Before turning Juror 370 over to the State, Dickerson pressed the juror on his belief regarding the defendant's burden of proof during the sentencing phase of a capital trial:

Q. . . . [W]ould you expect the defendant or his attorney to present something to you to give you a reason not to vote for death? To kind of convince you, 'Okay, I found him guilty of murder, I've heard all this other stuff but I['] m for death.' Would you expect the defense to show, 'you need to show me stuff that would convince me otherwise, to vote for life'?

A. (No verbal response).

Q. Is that what you're telling me?

A. I—yeah, isn't that what you've got to do?

. . . .

Q. And all that bad stuff in there and they just argue for mercy, that is not something that is going to persuade you?

A. No.

Q. So you would be looking at the defense to kind of convince you that a death penalty wasn't the right sentence?

A. Yeah. Just to represent him, show something—I mean, something had to happen.

During rehabilitation, the State informed Juror 370 that the judge would in fact instruct him that it was improper to hold a defendant's decision to not present any evidence against him. The following exchange then occurred:

Q. Because just a minute ago you were saying that you would expect the defendant to put something up.

A. Well, I mean—I thought that was kind of how it worked. But if—(pause).

Q. Well, the Judge would tell you that it works differently and—

A. If he told me that, yeah, then I wouldn't expect it.

Q. You wouldn't consider that, the fact that he didn't put anything up—any evidence?

A. Yeah.

Q. So you could follow the Judge's instructions?

A. Yes, ma'am.

The State then confirmed that Juror 370 would in fact be able to consider a sentence of life without parole even if the State proved aggravating circumstances.

During follow-up questioning by the court, the circuit judge repeated the State's question of whether Juror 370 would have any trouble abiding by the court's instruction that Dickerson would have nothing to prove, to which Juror 370 reiterated that he would not. However, Dickerson again asked whether Juror 370 would look to Dickerson to prove why the death penalty was not appropriate, to which Juror 370 said "yes," but Juror 370 then told the State once again that he would follow whatever the judge instructed him. Dickerson then moved to have Juror 370 disqualified because he was a "burden shifter" who would require the defense to prove that death should not be imposed. The court disagreed, finding Juror 370's statements that he would follow the law as instructed and he would want to hear all of the circumstances demonstrated he was not a burden shifter.

During the guilt phase, one of the many witnesses called by the State was Dr. Cynthia Schandl, the pathologist who performed Roper's autopsy. On direct examination, she testified that the blood toxicology report on Roper was negative, which demonstrated he did not have any drugs in his system when he died. On cross examination, Dickerson attempted to inquire about an initial urine screen test performed by Dr. Schandl that would show whether there were drugs present in Roper's system up to two days prior to his death. The State objected under Rule 403, SCRE. In her proffer, Dr. Schandl testified that this test was "presumptively positive" for cocaine metabolites, but Dr. Schandl never ordered confirmatory testing. According to her, these initial screening tests produce a large number of false positives and are very unreliable absent any sort of confirmation. Dickerson, however, argued the State's question about the blood toxicology results opened the door for this line of questioning as it left the jury with the misleading impression that Roper had not used cocaine. Finding the proffered testimony itself was actually misleading, the possibility of prejudice from excluding it was remote, it did not challenge any of Dr. Schandl's findings, and it would only serve to confuse the jury, the court refused to permit this line of questioning.

At the close of evidence, Dickerson requested the jury be charged on the law of accessory after the fact. The court, however, denied this request because accessory after the fact is not a lesser-included offense of murder. The jury subsequently convicted Dickerson on all charges. In the sentencing phase, the State proceeded under three aggravating factors: criminal sexual conduct, kidnapping, and torture, also highlighting Dickerson's prior criminal history and adaptability to prison life. Dr. Schandl testified again during the sentencing phase, repeating much of her testimony from the guilt phase. In particular, she emphasized that none of Roper's wounds were inflicted postmortem, and he died from the totality of his injuries rather than from any single blow.

In mitigation, Dickerson called several witnesses from the Charleston County Detention Center, where he was being held pending trial, who testified he was a model prisoner. He also called several witnesses who testified extensively regarding his drug use, childhood trauma, and mental problems. These witnesses further opined that he suffered from cocaine psychosis and attendant paranoia. Additionally, Dickerson's cousin, Johnette Watson, testified on his behalf. She stated he had always been like a brother to her, a good person who just got mixed up in the wrong things and with the wrong people. However, the court did not permit her to testify as to what impact his execution would have on her family, chiefly that her family would be devastated as it had already lost two close members to homicide.

Ultimately, the jury recommended the court impose a sentence of death, finding the State proved all three aggravating circumstances beyond a reasonable doubt. The court followed the jury's recommendation. This appeal followed pursuant to section 16–3–25.

## ISSUES PRESENTED

Dickerson raises four issues on appeal:

I. Did the circuit court err in qualifying Juror 370?

II. Did the circuit court err in not permitting Dickerson to cross examine Dr. Schandl regarding the urinalysis screen results?

III. Did the circuit court err in not charging the jury on the law of accessory after the fact?

IV. Did the circuit court err in not permitting Watson to testify regarding the impact Dickerson's potential execution would have on her family?

## LAW/ANALYSIS

### I. JUROR QUALIFICATION

██ Dickerson first argues the court erred when it found Juror 370 qualified to serve on the panel because he was a burden shifter, meaning he improperly placed the burden on the defense to show why death would not be an appropriate punishment. We disagree.

██ A juror must be excused from service if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)); *see also State v. Green*, 301 S.C. 347, 354, 392 S.E.2d 157, 160 (1990).

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do.... If even one such juror is empaneled and the death sentence is imposed, the state is disentitled to execute the sentence.

*Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). General protestations that the juror will follow the law, without the opportunity for further inquiry by the defendant, are not sufficient for "[i]t may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so." *Id.* at 734–36, 112 S.Ct. 2222; *see also State v. Bennett*, 328 S.C. 251, 257–58, 493 S.E.2d 845, 848 (1997) (holding that a juror's general statements he could be fair and impartial and follow the law were not sufficient in light of his later, unequivocal statement that he would just "go with the majority").

This inquiry, however, "cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Wainwright,* 469 U.S. at 424, 105 S.Ct. 844. Thus, the record may not be entirely clear to the point of "unmistakable clarity" as to the juror's views, and situations will arise where a circuit court simply is left with a "definite impression" of a juror's qualifications following voir dire. *Id.* at 425–26, 105 S.Ct. 844. "[T]his is why deference must be paid to the trial judge who sees and hears the juror." *Id.* at 426, 105 S.Ct. 844. Therefore, determinations of whether a juror is qualified to serve on a panel are left to the sole discretion of the circuit court. *Green,* 301 S.C. at 354, 392 S.E.2d at 160. In reviewing the circuit court's decision, we must examine the juror's responses in light of the entire voir dire and will not reverse the court's decision unless it is wholly unsupported by the evidence. *Id.* at 354, 392 S.E.2d at 160–61.

Although Juror 370 unquestionably displayed some equivocation on how he might vote should the State prove an aggravating circumstance, the State's rehabilitation revealed this was more the result of a misunderstanding of the trial process than any firmly held belief that he would automatically vote for the death penalty. For example, after stating that he would expect the defense to put forth evidence in mitigation, Juror 370 stated, "isn't that what you've got to do" and "I thought that was kind of how it worked." He went on to state, however, if the court instructed him that the defense bore no burden, he "wouldn't expect it." He also stated he "would have to hear all of the evidence" before he would say "give them the death penalty." Although similar exchanges occurred throughout the voir dire, the one thing he was unequivocal about was that he would follow the law as it was instructed to him by the court. Consistent with *Morgan,* Dickerson was allowed to probe the true nature of Juror 370's beliefs, and that examination produced nothing resembling either a deep-seeded preference for the death penalty or a true belief Dickerson must prove that death is not appropriate.

After a review of the entire voir dire, the salient portions of which are reproduced above, this in-depth examination produced evidence to support the court's ruling that Juror 370

could be a fair and impartial juror, acting in accordance with the court's instructions and not merely blindly professing that he would do so. The circuit judge was more persuaded by the juror's consistent affirmation he would follow the law and wait to hear all of the evidence than by his apparent confusion over the State's burden, and we believe his ultimate determination of Juror 370's qualification to serve is supported by the record.

## II. CROSS EXAMINATION OF DR. SCHANDL

██ Next, Dickerson argues the circuit court erred in preventing him from asking Dr. Schandl about the urine screen test she performed on Roper in conjunction with the autopsy. We disagree.

██ "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, SCRE. The admission of evidence is within the circuit court's discretion and will not be reversed on appeal absent an abuse of that discretion. *State v. Gaster*, 349 S.C. 545, 557, 564 S.E.2d 87, 93 (2002).

On direct examination, Dr. Schandl testified that Roper's blood toxicology report was negative, meaning there were no drugs in his system when he died. On cross examination, Dickerson attempted to elicit the results of a preliminary urinalysis test that would show whether Roper used cocaine within two days prior to his death. In her proffer in response to the State's objection under Rule 403, SCRE, Dr. Schandl stated that while the urine screen test performed was "presumptively positive," that test alone is unreliable and no confirmatory testing was done. The circuit court refused to admit this evidence, agreeing this form of testing was inherently unreliable and therefore would be misleading, would confuse the jury, and actually did not challenge any of Dr. Schandl's conclusions. We agree.

The relevance of whether the *victim* had used cocaine within the two days prior to his death is dubious, at best, under the facts of this case. Dickerson calls this presumptive test "an inconvenient truth for the [S]tate," but we fail to see

in what way it is inconvenient; it does not challenge any of Dr. Schandl's findings regarding Roper's cause of death and would only have injected irrelevant considerations into the trial. Therefore, there is little, if any, probative value to this evidence, and it would only serve to confuse the jury and distract it from the case at hand.

Dickerson turns to Rule 608(c), SCRE, to supply the requisite relevance and probative value, arguing this testimony demonstrates Dr. Schandl's bias, prejudice, or motive to lie. "[A]nything having a legitimate tendency to throw light on the accuracy, truthfulness, and sincerity of a witness may be shown and considered in determining the credit to be accorded his testimony. On cross-examination, any *fact* may be elicited which tends to show interest, bias, or partiality of the witness." *State v. Saltz*, 346 S.C. 114, 131–32, 551 S.E.2d 240, 250 (2001) (quotations omitted). However, the proffered cross examination did not elicit a single fact that might shed any light on a potential motive or bias for Dr. Schandl to misrepresent. Although Dickerson is correct that Dr. Schandl was the key witness for the State regarding cause of death and torture, that fact alone certainly does not establish a reason for her to lie, and the proffered testimony does not complete the circle.

Similarly, we reject Dickerson's argument that the evidence must be available to rebut the "false impression" created by the State when Dr. Schandl testified that Roper's blood toxicology report was negative. A defendant generally is entitled to rebut false impressions created by the State's evidence. *See State v. Northcutt*, 372 S.C. 207, 221, 641 S.E.2d 873, 880 (2007). Dickerson argues the false impression he is entitled to rebut is that Roper did not use cocaine. Even assuming Dr. Schandl's testimony did create this impression, Roper's drug use is irrelevant in this case. Therefore, this plainly is not a situation where the false impression created is at all prejudicial to the defendant. Permitting Dickerson to respond would only take her testimony further down that rabbit hole.

Accordingly, we hold the circuit court did not abuse its

discretion in excluding this evidence.[4]

## III. ACCESSORY AFTER THE FACT

Dickerson next argues the circuit court erred in failing to charge the jury on the law of accessory after the fact. We disagree.

■■■■■ In a capital case, a defendant is entitled to a charge on any lesser-included offenses of murder when supported by the evidence. *See Beck v. Alabama,* 447 U.S. 625, 635–38, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). A lesser-included offense is one whose elements are wholly contained within the crime charged. *Northcutt,* 372 S.C. at 215, 641 S.E.2d at 877. Stated differently, if the offense contains any elements that are not part of the crime charged, then it is not a lesser-included offense. *Id.* However, even if an offense does not meet the elements test, it will be considered a lesser-included offense if it "has traditionally been considered a lesser included offense of the greater offense charged." *Id.* at 216, 641 S.E.2d at 877–78. The Supreme Court of the United States stated the rationale for requiring charges on lesser-included offenses as follows:

> For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.

*Beck,* 447 U.S. at 637, 100 S.Ct. 2382. A court must therefore charge on lesser-included offenses that are supported by the evidence in order to enhance the reliability of guilt determinations. *Id.* at 638, 100 S.Ct. 2382.

■■■■■ It is well-settled that accessory after the fact is not a lesser-included offense of murder in this State.[5] *State v.*

---

4. We emphasize that there is absolutely no suggestion, let alone evidence, that Dr. Schandl or the State purposefully failed to run confirmatory tests in order to exclude the evidence Dickerson sought to introduce.

5. The elements of accessory after the fact are that the felony has been completed, the accused had knowledge that the principal felon commit-

*Fuller*, 346 S.C. 477, 481, 552 S.E.2d 282, 284 (2001). There-fore, *Beck* standing alone does not require a court to charge the jury on accessory after the fact. Dickerson, however, argues that accessory after the fact is a "lesser-related of-fense" of murder and *Beck*, when combined with our decision in *State v. Gentry*, 363 S.C. 93, 610 S.E.2d 494 (2005), man-dates a charge on it when requested.

■ In *Gentry*, we held that the concepts of subject matter jurisdiction and sufficiency of an indictment are dis-tinct. 363 S.C. at 101, 610 S.E.2d at 499. A court therefore has subject matter jurisdiction to hear cases even if the indictment fails to allege all the elements of the offense. *See id.* Accordingly, if the defendant fails to challenge the suffi-ciency of the indictment prior to the jury being sworn, he waives that challenge. *Id.* at 102, 610 S.E.2d at 500.

Dickerson extrapolates from this the ability to charge a lesser-related offense because the court would still have sub-ject matter jurisdiction over the claim, and it is therefore inconsequential that he was not indicted as an accessory. Thus, a defendant should be able to request a charge on any related offense supported by the evidence, regardless of whether it is included within the ones for which he was indicted.[6] We do not read *Gentry* so broadly. While the

---

ted the felony, and the accused harbored or assisted the principal. *Fuller*, 346 S.C. at 480, 552 S.E.2d at 283. Murder is simply defined as "the killing of any person with malice aforethought, either express or implied." S.C.Code Ann. § 16-3-10 (2003).

6. Under Dickerson's view, only the defendant would have the option of requesting this additional charge. The Supreme Court of California resoundingly rejected this very point. *Birks*, 77 Cal.Rptr.2d 848, 960 P.2d at 1084-86. Following *Hopkins*, questions concerning the right to a charge on a lesser-related offense are of course questions of state law. However, we find the California court's reasoning on this point persua-sive. *Birks* was re-examining the court's prior decision in *People v. Geiger*, 35 Cal.3d 510, 199 Cal.Rptr. 45, 674 P.2d 1303 (1984), which held in part that only the defendant could request a charge on a lesser-related offense. *See Birks*, 77 Cal.Rptr.2d 848, 960 P.2d at 1083. In reversing this portion of *Geiger*, the *Birks* court found that such a rule created

an unfair one-way street where lesser related offenses are at issue. On the one hand, the defendant's right to notice of the charges limits the circumstances in which a jury, over the *defendant's* objection, may receive instructions on lesser offenses which are not necessarily

circuit court may have had subject matter jurisdiction to try Dickerson as an accessory after the fact, *Gentry* merely held that a defendant must challenge an indictment prior to the swearing of the jury. Because the sufficiency of the indictment is not at issue here, *Gentry* is inapposite.

The Supreme Court of the United States has held that, unlike lesser-included offenses under *Beck*, there is no constitutional requirement to charge a jury on lesser-related offenses. *Hopkins v. Reeves*, 524 U.S. 88, 90–91, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998); *see also People v. Birks*, 19 Cal.4th 108, 77 Cal.Rptr.2d 848, 960 P.2d 1073, 1087–88 (1998) (finding the analysis in *Reeves* "utterly convincing" and rejecting a charge on lesser-related offenses). Such a requirement would be "unprecedented" and "unworkable" because there would be no real basis for determining when such charges would be warranted. *Hopkins*, 524 U.S. at 97, 118 S.Ct. 1895. Fur-

---

included in those to which a plea was entered. On the other hand, if a lesser offense is related to the charge, as *Geiger* defines that term, *Geiger* gives the *defendant an absolute entitlement* to such instructions on request, regardless of notice or prejudice to the People, and even over their objection.

. . . .

Where lesser related offenses are concerned, the *Geiger* rule therefore may actually permit and encourage a one-sided use of the "gambling hall" strategies we have consistently denounced. If the evidence suggests the possibility of a related lesser offense neither charged nor tried by the prosecution, the defendant either may demand that instructions on that offense be given, or may raise notice objections which, if successful, will prevent such instructions from being given at the prosecution's behest. *Geiger* thus affords the defense a superior right at trial to determine whether the jury will consider a lesser offense alternative, or instead will face an all-or-nothing choice between conviction of the stated charge and complete acquittal. Such a rule is neither just nor rational.

*Id.*, 77 Cal.Rptr.2d 848, 960 P.2d at 1085. Contrary to the concurrence's view, *Gentry*'s holding—that an indictment is a notice document that must be challenged prior to the swearing of the jury—is unaffected by our decision today. *See* 363 S.C. at 102, 610 S.E.2d at 500. Here, we merely find that a defendant's ability to waive notice of a particular charge does not also grant him an unqualified, non-reciprocal right to request any charge supported by the evidence, for to do so would grant him an unfair tactical advantage that interferes with the State's prerogative of deciding on which charges to try a defendant. *See State v. Thrift*, 312 S.C. 282, 291–92, 440 S.E.2d 341, 346 (1994) ("Both the South Carolina Constitution and South Carolina case law place the unfettered discretion to prosecute solely in the prosecutor's hands.").

thermore, charging on lesser-related offenses, which by their nature generally contain elements that are not included within the crimes for which the defendant was charged and tried, would permit the jury "to find beyond a reasonable doubt elements that the State had not attempted to prove, and indeed that it had ignored during the course of the trial. This can hardly be said to be a reliable result." *Id.* at 99, 118 S.Ct. 1895.

We agree with the Supreme Court's reasoning in *Hopkins* that permitting such a charge does not further the policy behind charging lesser-included offenses. The core of *Beck*'s requirement was to ensure reliability in the proceedings by giving the jury a third option beyond acquittal or conviction so that its verdict will better conform to the evidence presented. The *Hopkins* Court, on the other hand, believed that charging on lesser-related offenses would diminish the proceeding's reliability by permitting the jury to convict the defendant of a crime the State never even sought to prove at trial.

Therefore, we adopt the Supreme Court's holding in *Hopkins* and hold that a defendant is not entitled to a charge on lesser-related offenses. Here, permitting the jury to convict Dickerson as an accessory after the fact would permit the jury to find beyond a reasonable doubt elements of a crime the State never sought to prove and Dickerson was not on notice he had to defend against. Accordingly, we affirm the circuit court's denial of Dickerson's request to charge.

## IV. EXECUTION IMPACT EVIDENCE

Finally, Dickerson argues the circuit court erred in preventing his cousin, Johnette Watson, from testifying as to what effects Dickerson's execution would have on her family. We disagree.

During the sentencing phase of a capital trial, the defense must be able to present mitigating evidence on "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (quoting *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality)); *Northcutt,* 372 S.C. at 221, 641 S.E.2d

at 880. The jury is entitled to hear this evidence so that it may "give a 'reasoned *moral* response to the defendant's background, character, and crime' " and prevent it from reacting out of an "unguided emotional response." *Penry v. Lynaugh*, 492 U.S. 302, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 184, 108 S.Ct. 2320, 101 L.Ed.2d 155 (O'Connor, J., concurring)), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). However, *Eddings* does not limit a court's ability to exclude evidence not bearing on the defendant's character, his prior record, or the circumstances of the crime as being irrelevant. 438 U.S. at 604 n. 12, 98 S.Ct. 2954.

 For example, "[a] capital defendant is prohibited from directly eliciting the opinion of family members or other penalty-phase witnesses about the appropriate penalty. Such questions go to the ultimate issue to be decided by the jury—life in prison versus the death penalty—and are properly reserved for determination by the jury." *State v. Wise*, 359 S.C. 14, 27, 596 S.E.2d 475, 481 (2004). A capital defendant also cannot present witnesses who will testify as to what punishment the jury "ought" to recommend. *Id.* However, defense witnesses who know the defendant well can beg for mercy on his behalf. *Id.* Whether certain evidence is a plea for mercy versus an opinion of what is the appropriate penalty can be a close call and thus is left to the discretion of the trial judge; that decision will not be disturbed absent an abuse of discretion. *Id.* at 21, 596 S.E.2d at 478.

The thrust of Dickerson's argument is that the emotional impact an execution would have on his family members demonstrates that he has the ability to form cohesive, lasting relationships with others, a trait that reflects positively on his character. We agree that evidence of a defendant's ability to form positive relationships with others is evidence that *Eddings* renders admissible. And here, Watson testified without objection to the close bond she shared with Dickerson and how he was like a brother to her. However, execution impact evidence can easily cross the line from illuminating a defendant's character or a plea for mercy to an opinion of what is the proper punishment.

Had the court permitted Watson to testify as planned, she would have testified her family lost two members to homicide: her brother as well as another cousin of Dickerson's. Dickerson's execution would therefore exacerbate the suffering her family has already endured. This evidence no longer concerns Dickerson's character but rather borders on an opinion that Dickerson should not be executed in order to spare her family the suffering. Watson's proffered testimony thus strayed from relevant considerations into the realm of an opinion regarding which punishment the jury ought to recommend. Under our standard of review, we find the circuit court did not abuse its discretion in sustaining the State's objection in this case.[7]

## V. PROPORTIONALITY REVIEW

Pursuant to section 16–3–25(C), we must conduct a review of Dickerson's sentence. In doing so, we must determine whether the sentence was the result of passion, prejudice, or any other arbitrary factor; whether there is evidence to support the jury's findings; and whether the sentence is excessive or disproportionate to the sentences imposed in similar cases. *See id.*

 First, we cannot find anything demonstrating that the sentence was the result of passion, prejudice, or any other arbitrary factor. Although Dickerson's attorneys did a com-

---

7. We recognize that the vast majority of jurisdictions to address this issue have found execution impact evidence to be inadmissible. *See Woods v. State*, 13 So.3d 1, 33 (Ala.Crim.App.2007); *State v. Chappell*, 225 Ariz. 229, 236 P.3d 1176, 1185 (2010); *People v. Vieira*, 35 Cal.4th 264, 25 Cal.Rptr.3d 337, 106 P.3d 990, 1009 (2005); *Burns v. State*, 699 So.2d 646, 654 (Fla.1997); *People v. Armstrong*, 183 Ill.2d 130, 233 Ill.Dec. 252, 700 N.E.2d 960, 971 (1998); *Ross v. State*, 954 So.2d 968, 1013 (Miss.2007); *Williams v. State*, 168 S.W.3d 433, 445 (Mo.2005); *State v. Loftin*, 146 N.J. 295, 680 A.2d 677, 713 (1996); *State v. Hale*, 119 Ohio St.3d 118, 892 N.E.2d 864, 893 (2008); *Commonwealth v. Harris*, 572 Pa. 489, 817 A.2d 1033, 1054 (2002); *Roberts v. State*, 220 S.W.3d 521, 532 (Tex.Crim.App.2007); *State v. Stenson*, 132 Wash.2d 668, 940 P.2d 1239, 1282 (1997). *But see State v. Stevens*, 319 Or. 573, 879 P.2d 162, 168 (1994). However, we decline to adopt a categorical rule. If the proffered evidence fits within the boundaries discussed in *Wise* and goes to the defendant's character, it is admissible. While we are cognizant of the reasons why these courts declined to permit this evidence, we are confident that our existing framework is sufficient to ferret out problematic testimony.

mendable job representing him during both phases of trial, the gruesome nature of Dickerson's acts fits squarely within the aggravating circumstances for which the jury recommended the death penalty. Furthermore, there is no indication that the proceedings were tainted in any way or that the sentence was anything other than a rational response to the evidence presented.

 Second, and similarly, we hold evidence exists to support the jury's finding that the State met its burden with respect to all three aggravating circumstances. The record readily demonstrates Dickerson kidnapped Roper, committed criminal sexual conduct on him, and tortured him. Indeed, the jury separately convicted Dickerson of kidnapping and criminal sexual conduct during the guilt phase of the trial. We can find nothing reflecting an absence of proof as to any of these aggravating factors.

 Finally, we believe Dickerson's sentence is neither excessive nor disproportionate in light of the results in similar cases. In capital cases where the State proceeded on the aggravating circumstances of kidnapping, criminal sexual conduct, torture, or any combination thereof, this Court has routinely affirmed the sentence of death. *See State v. Stanko*, 376 S.C. 571, 573, 579, 658 S.E.2d 94, 95, 98 (2008) (affirming death penalty where defendant strangled girlfriend and attempted to murder her daughter during the course of a robbery and sexual assault); *State v. Evins*, 373 S.C. 404, 410–11, 422, 645 S.E.2d 904, 907, 913 (2007) (affirming death sentence where defendant kidnapped victim, sexually assaulted her, and stabbed her twelve times); *State v. Simmons*, 360 S.C. 33, 37, 46, 599 S.E.2d 448, 449–50, 454 (2004) (affirming death sentence where defendant robbed the victim, beat her with a stick, strangled her, and sexually assaulted her while she was "half and half" alive); *State v. Stokes*, 345 S.C. 368, 371, 377, 548 S.E.2d 202, 203, 206–07 (2001) (affirming death sentence where the defendant had sex with the victim, stabbed her, continued to have sex with her, shot her in the head, and then mutilated her body); *State v. Johnson*, 338 S.C. 114, 120–21, 130, 525 S.E.2d 519, 521–22, 527 (2000) (affirming death sentence where the defendant robbed the victim at knifepoint, kidnapped her, tied the victim up, and sliced her multiple

times with a machete); *State v. Whipple*, 324 S.C. 43, 46, 54, 476 S.E.2d 683, 685, 689 (1996) (affirming death sentence where defendant stabbed victim multiple times, beat her with a lamp and an iron, strangled her with a lamp cord, stuck a dish towel in her mouth, and sexually assaulted her).[8]

Accordingly, we find that the death penalty was warranted in this case.

## CONCLUSION

For the foregoing reasons, we affirm Dickerson's conviction for murder and the circuit court's sentence of death.

---

8. Before the circuit court, Dickerson argued that our current proportionality review is deficient because it fails to examine cases where death was not imposed and cases where death was not even sought. *See State v. Copeland*, 278 S.C. 572, 591, 300 S.E.2d 63, 75 (1982). He primarily relied upon Justice Stevens's statement regarding the denial of certiorari in *Walker v. Georgia*, —— U.S. ——, 129 S.Ct. 453, 172 L.Ed.2d 344 (2008) (memorandum opinion), in which he wrote that examining similar cases "assume[s] that the court would consider whether there were 'similarly situated defendants' who had *not* been put to the death because that inquiry is an essential part of any meaningful proportionality review." *Id.* at 454. In his view, this analysis is "judicious because, quite obviously, a significant number of similar cases in which death was not imposed might well provide the most relevant evidence of arbitrariness in the sentence before the court." *Id.* Justice Stevens noted,

> Had the Georgia Supreme Court looked outside the universe of cases in which the jury imposed a death sentence, it would have found numerous cases involving offenses very similar to petitioner's in which the jury imposed a sentence of life imprisonment. If the Georgia Supreme Court had expanded its inquiry still further, it would have discovered many similar cases in which the State did not even seek death. Cases in both of these categories are eminently relevant to the question of whether a death sentence in a given case is proportionate to the offense. The Georgia Supreme Court's failure to acknowledge these or any other cases outside the limited universe of cases in which the defendant was sentenced to death creates an unacceptable risk that it will overlook a sentence infected by impermissible considerations.

*Id.* at 455–56 (citations omitted). This issue is not before us on appeal, and it would require us to overrule our prior decision in *Copeland*. However, we note our concern that restricting our statutorily-mandated proportionality review to only similar cases where death was actually imposed is largely a self-fulfilling prophecy as simply examining similar cases where the defendant was sentenced to death will almost always lead to the conclusion that the death sentence under review is proportional.

BEATTY, KITTREDGE, JJ., and Acting Justice JAMES E. MOORE, concur. PLEICONES, J., concurring in a separate opinion.

Justice PLEICONES.

I concur in the decision to affirm this capital appeal and sentence, but write separately to address both the lesser-included issue and the majority's suggestion in footnote 8 that we should consider altering our approach to proportionality review.

I agree with the majority that appellant has no constitutional right to a charge on a lesser-related offense. *Hopkins v. Reeves,* 524 U.S. 88, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998). Rather, the question of a defendant's right to such a charge is a matter of state law. *Id.; see e.g., Sheffield v. State,* 64 So.3d 529 (Miss.Ct.App.2011). In my opinion, *State v. Gentry,* 363 S.C. 93, 610 S.E.2d 494 (2005), fundamentally altered state law by converting an indictment, which theretofore had been a jurisdictional document, into a mere notice document. *Id.* at 102–103, 610 S.E.2d at 500. Since the notice is directed only to the defendant, in my opinion, it is within his sole prerogative to waive such notice.

Unlike the majority, I find nothing in *People v. Birks,* 19 Cal.4th 108, 77 Cal.Rptr.2d 848, 960 P.2d 1073 (1998) which conflicts with my view that a court may authorize a criminal defendant to request a jury charge on a lesser-related offense. In *Birks,* the California Supreme Court held it had created a state constitutional problem by extending to the defendant alone the right to request such a charge on state due process grounds, and reversed its earlier decision. If the Court agrees with *Birks* that it is a constitutional violation to give only one party in a criminal proceeding the right to request such a charge, then the problem can be remedied by overruling *Gentry.*

On the merits, I find no reversible error in the circuit court's decision not to charge the jury on the lesser-related offense of accessory after the fact because such a charge was not supported by the evidence. *See State v. Collins,* 329 S.C. 23, 495 S.E.2d 202 (1998) (elements of accessory after the fact explained).

I believe that when S.C.Code Ann. § 16-3-25(C)(3) (2003) requires us to determine whether the death sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant," and to refer to the similar cases that we considered, we should confine our review to only those cases in which a death sentence was imposed.[9] *State v. Copeland,* 278 S.C. 572, 300 S.E.2d 63 (1982)(only review of appeals where death sentence was imposed satisfies both state statute and constitution). As *Copeland* explains, to include in our review cases where a capital sentence was sought but not imposed requires us to speculate on, among other things, the solicitor's decision-making process, the strength of the State's case, and/or upon the jurors' or trial judge's decision to exercise mercy. Moreover, our reference for proportionality extends only to cases which are appealed, and thus is not truly representative of all cases where the death penalty was or could have been sought. Experience teaches that many of these cases where a lesser sentence is imposed are never appealed.

On the merits, I agree that the death sentence imposed upon appellant is not disproportionate.

For the reasons given above, I concur.

---

9. Like the majority, I have enormous respect for Justice Stevens. If we were to be true to his views on capital sentencing, however, we would join his minority view that imposition of the death sentence violates the Eighth Amendment's prohibition on cruel and unusual punishment. *Baze v. Rees,* 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (decided the term before he issued his *Walker v. Georgia* statement). While perhaps Justice Stevens would find our practice of reviewing only other capital cases violative of the Eighth Amendment, the fact remains that proportionality review is a requirement only of state law, not the Constitution. *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).