# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Luzenski Allen Cottrell, Appellant.

Appellate Case No. 2015-000731

————————

Appeal From Horry County
The Honorable Larry B. Hyman, Jr., Circuit Court Judge

————————

Opinion No. 27754
Heard May 24, 2017 – Filed December 20, 2017

————————

**AFFIRMED**

————————

Keir M. Weyble and Sheri L. Johnson, both of Cornell
Law School, of Ithaca, New York, and Robert M. Dudek,
of Columbia, for Appellant.

Attorney General Alan Wilson, Senior Assistant Deputy
Attorney General Donald J. Zelenka and Assistant
Attorney General J. Anthony Mabry, all of Columbia,
and Solicitor Jimmy A. Richardson, of Conway, for
Respondent.

————————

**JUSTICE HEARN:** Appellant Luzenski Allen Cottrell was convicted and
sentenced to death by an Horry County jury for the 2002 murder of Myrtle Beach

police officer Joe McGarry.  On appeal, Cottrell now raises five issues, all of which involve rulings largely addressed to the trial judge's discretion.  Finding no abuse of discretion by the trial judge, we affirm his conviction and sentence.

## FACTS

Shortly after midnight on December 29, 2002, McGarry and fellow police officer Mike Guthinger entered a Dunkin Donuts in the city of Myrtle Beach.  Both officers were in uniform and on duty, completing a traffic stop a short time earlier before deciding to get coffee.  Upon entering Dunkin Donuts, McGarry immediately recognized Cottrell, who was ordering coffee at the register with two companions, Diane Lawson and Fred Halcomb.  McGarry was familiar with Cottrell, having had several previous encounters with him, including arresting Cottrell for possession with intent to distribute marijuana earlier that year.  More significantly, Lt. Amy Prock of the Myrtle Beach Police Department had recently notified McGarry that Cottrell had been identified as a possible suspect[1] in the shooting death of Rick Hartman, whose body had been found in a rural part of Horry County roughly a month earlier.

Upon recognizing Cottrell, McGarry informed Guthinger that Cottrell was identified as a suspect in a shooting and that he was possibly carrying a gun.  Rather than proceed in line to get coffee, McGarry and Guthinger exited the Dunkin Donuts and approached Cottrell on the sidewalk as he stepped out the door.  McGarry asked Cottrell whether he remembered him, and then inquired as to whether he had taken care of the previous charges for which McGarry had arrested him.  Cottrell indicated they were all taken care of.  At that point, McGarry asked Cottrell for his identification and informed him he was going to run an NCIC check to see if Cottrell had any outstanding warrants.

While waiting for a response from the dispatcher after calling in Cottrell's information, McGarry indicated to Cottrell that he was going to perform a pat-down for weapons.  Cottrell told McGarry "no" before turning and walking away toward another vehicle driven by Donnie Morgan, who was part of Cottrell's group but unknown to the officers at the time.  Cottrell's right hand was somewhere near the

---

[1] Halcomb was also identified as a suspect in Hartman's death, but he was not immediately recognizable to the officers.

front of his waistband as he turned and walked away.[2]  McGarry then immediately began yelling for Cottrell to stop and show his hands.  When Cottrell did not comply, McGarry unholstered his weapon and again commanded Cottrell to show his hands. With Cottrell's back still turned to him, McGarry reholstered his weapon and rushed towards Cottrell from behind, struggling to grab Cottrell's right hand which was near the front of his waistband, while McGarry's left hand was somewhere on Cottrell's upper back or shoulder, attempting to gain control of him.

The pair stumbled and separated as they slid toward the rear of the Morgan vehicle.  As they regained their balance and squared up, Cottrell raised a .45 caliber handgun and fired a shot, striking McGarry in the face from eight to twelve inches away.  The shot incapacitated McGarry, who fell backwards and struck his head on the pavement.[3]

Immediately upon seeing Cottrell shoot McGarry, Guthinger drew his weapon and fired several shots at Cottrell, striking him in the leg as Cottrell sought cover behind Morgan's car.[4]  Guthinger and Cottrell continued to exchange gunfire, and

[2] Cottrell was wearing an oversized, baggy jersey, which Guthinger testified made it impossible for him to see whether he had a concealed handgun underneath, though he also stated that such oversized clothing was often worn for the purposes of concealing illegal weapons.  Though there was no eye witness testimony to confirm it, the State's theory was that at some point while waiting for the NCIC to come back, McGarry caught a glimpse or saw the imprint of a concealed handgun on Cottrell's person, thereby causing McGarry's rapid change in demeanor and his instructions to Cottrell to keep his hands visible.

[3] Guthinger testified he witnessed Cottrell raise his gun and shoot McGarry, and that the sound of the first shot was simultaneous with the muzzle blast he saw from the gun's muzzle.  Guthinger then heard a second shot but did not see a muzzle flash. Experts confirmed that McGarry's weapon fired a shot, and Lawson, who witnessed the events from the passenger seat in Halcomb's vehicle, testified that McGarry's weapon discharged while he was falling backwards after being shot by Cottrell.

[4] There was some dispute as to when Cottrell was shot.  The defense produced an expert who testified that Cottrell was shot from the front, attempting to convince the jury that McGarry fired the first shot and struck Cottrell.  Guthinger testified that he shot Cottrell, and that Cottrell was moving without any signs of injury immediately

numerous vehicles and nearby buildings were struck by bullets. At some point during the shootout, Cottrell told Guthinger he was surrendering, prompting Guthinger to leave his protected position to place him under arrest. However, as he approached, Cottrell reloaded his firearm and resumed shooting at Guthinger, who retreated to cover and called for backup.

Cottrell fled the scene and responding officers engaged in a high speed chase through Myrtle Beach until his getaway vehicle was brought to a halt using stop sticks to disable the tires, and he was placed under arrest. Police recovered the .45 caliber weapon that was forensically matched to the bullet which killed McGarry, along with another loaded .357 revolver in the backseat. Officers attempted to perform CPR on McGarry, but he passed away in the Dunkin Donuts parking lot.

## PROCEDURAL HISTORY

Cottrell was first tried for the murder of McGarry in 2005. At that trial, the jury found him guilty of murder, assault with intent to kill, resisting arrest, and grand larceny. Cottrell appealed the murder conviction, and this Court reversed, finding the trial court erred in refusing to give the jury an instruction on voluntary manslaughter in addition to murder. *State v. Cottrell*, 376 S.C. 260, 265, 657 S.E.2d 451, 454 (2008) (hereinafter referred to as *Cottrell I*). The other convictions remained, but Cottrell was granted a new trial on the murder charge.

Weeks prior to the scheduled start of Cottrell's second trial in March 2012, the solicitors representing the State had separate conversations with Cottrell's appointed attorneys, at which time each accused co-counsel of misconduct and questioned their ability to adequately represent Cottrell in light of their difficulty working together. The solicitors made the trial judge aware of these allegations, and he conducted discussions in chambers with the appointed attorneys, who both confirmed they had indeed made the allegations brought to light by the State. Both attorneys also indicated they felt their inability to work together jeopardized Cottrell's defense.

---

after shooting McGarry, and only after Guthinger fired at him did Cottrell begin hopping or limping on one leg. In a statement to police following the shooting, Cottrell stated he believed it was Guthinger who shot him, not McGarry. Lawson also confirmed that it was Cottrell who fired the first shot, while McGarry then fired as he was falling to the ground.

In a pre-trial hearing, the trial judge expressed his concerns over the allegations made by Cottrell's attorneys, questioning whether it was possible for them to effectively represent Cottrell. Cottrell's attorneys stated they could put their differences aside and work together so the case could proceed, but acknowledged they would defer to the trial judge's decision. One of the attorneys admitted that the allegations were probably sufficient to solidify post-conviction relief if the case went forward. The trial judge then gave Cottrell an opportunity to discuss the matter with his attorneys. After their discussion, Cottrell reiterated he felt confident in his attorneys' ability to represent him, but that he would defer to the trial judge's decision. Ultimately, due to his concerns for Cottrell's representation and the ability of the attorneys to overcome their problems just two weeks before trial, the trial judge decided to relieve both attorneys. After appointing new defense counsel,[5] the trial judge afforded Cottrell more than two years before rescheduling the trial so that his new attorneys would have adequate time to prepare.

Cottrell was eventually tried and found guilty of murder, and the case proceeded to sentencing. During the sentencing phase, the jury heard evidence of Cottrell's prior bad acts, including a prior conviction for the murder of Jonathan Love in Marion County, as well as testimony surrounding Hartman's murder, which the State asserted Cottrell was responsible for although the case had not yet been tried.[6]

After deliberating for approximately two hours over Cottrell's sentence, the jury sent a note to the trial judge indicating there were eleven jurors for the death penalty and one for life, asking, "What is the next step?" The trial judge did not disclose to the parties what the split was at that time, instead reading a redacted version without the numerical count, and informing them that he would instruct the jury to continue deliberations. Because the jury had only been deliberating for two hours, the trial judge concluded it was too early to give an *Allen*[7] charge. The jury

_____

[5] There is no dispute over replacement counsel's qualifications to represent Cottrell.

[6] After Cottrell's second trial and conviction for the murder of McGarry, the State decided not to further pursue charges against Cottrell for the Hartman murder.

[7] *Allen v. United States*, 164 U.S. 492 (1896).

continued its deliberations and ultimately returned with a unanimous recommendation that Cottrell be sentenced to death.[8] Cottrell now raises five issues in his appeal to this Court.

## ISSUES PRESENTED

I.  Did the trial judge's removal of Cottrell's appointed attorneys violate his right to counsel and due process under the Sixth and Fourteenth Amendments?

II.  Was Cottrell's right to a fair and reliable sentencing determination violated as a result of the qualification and seating of two jurors whose expressed views prevented or substantially impaired their ability to consider constitutionally relevant mitigating evidence?

III.  Did the trial judge err in excluding the testimony of Detective Nathan Johnson on the grounds that the risk of prejudice substantially outweighed its probative value?

IV. Did the trial judge err by refusing to instruct the jury not to infer malice exclusively from the use of a deadly weapon?

V.  Did the trial judge err by refusing to disclose the contents of a jury note to Cottrell's defense counsel during sentencing deliberations?

## ANALYSIS

I. REMOVAL OF ATTORNEYS

Cottrell contends that the removal of his appointed counsel without any factual findings on the record was an unnecessary termination of his existing attorney-client relationship and a violation of his Sixth Amendment rights.  On the other hand, the State asserts the removal of Cottrell's counsel was an appropriate exercise of discretion by the trial judge.  Given the trial judge's discretionary

---

[8] The jury found three aggravating circumstances present to warrant the imposition of the death penalty: (1) a prior murder conviction; (2) the killing of a police officer in the line of duty; and (3) conduct that created a great risk of death to more than one person in a public place.  *See* S.C. Code Ann. § 16-3-20(C) (2015).

authority and his duty to ensure the integrity of the judicial process and safeguard Cottrell's right to effective counsel, we find the trial judge did not abuse his discretion in removing Cottrell's attorneys and appointing new counsel.

An accused has the right to assistance of counsel. U.S. Const. amend. VI. However, the Sixth Amendment right to counsel is "circumscribed by the trial court's obligation to safeguard the integrity of the proceedings and ensure trials are conducted according to the ethical standards of the profession." *State v. Sanders*, 341 S.C. 386, 389, 534 S.E.2d 696, 697 (2000). Thus, a motion to relieve counsel is left to the discretion of the trial judge and will not be disturbed absent an abuse of discretion. *State v. Justus*, 392 S.C. 416, 418, 709 S.E.2d 668, 670 (2011). In determining whether to remove a defendant's attorneys, a court must balance a defendant's right to choose his own counsel "against the need to maintain the highest ethical standards of professional responsibility." *Sanders*, 341 S.C. at 390, 534 S.E.2d at 698. The Fourth Circuit has explained that a trial judge must be allowed "substantial latitude" and broad discretion in disqualifying a defendant's chosen lawyer so the trial judge may "rule without fear that it is setting itself up for reversal on appeal." *U.S. v. Howard*, 115 F.3d 1151, 1155 (4th Cir. 1997).

Cottrell characterizes the trial judge's removal of his counsel as arbitrary and unsupported by any basis in the record, citing to *United States v. Gonzales-Lopez*, 548 U.S. 140, 147–48 (2006), for the proposition that the removal of his attorneys was a structural error under the Sixth Amendment. We disagree.

While Cottrell is correct in asserting that the *erroneous* deprivation of a defendant's counsel of choice is a structural error in violation of the Sixth Amendment, the key qualifying language in that statement of law requires that the removal of defendant's chosen counsel be erroneous. In *Gonzales-Lopez*, the United States Supreme Court noted that the right to counsel of choice is not absolute and is subject to several limitations, but because the government conceded that the district court *erroneously* deprived respondent of his counsel of choice and without proper justification, the broad discretion normally afforded to trial judges was not applicable. *Id.* at 152. Importantly though, the *Gonzalez-Lopez* court made clear that its holding did not cast any doubt or place any qualifications upon its prior holdings that "limit the right to counsel of choice and recognize the authority of trial courts to establish criteria for admitting lawyers to argue before them." *Id.* at 151. Reaffirming its earlier holdings, the Court further noted this right to counsel of choice does not extend to defendants represented by appointed counsel. *Id.* The

Court also reiterated the wide latitude that must be afforded to trial courts in balancing the right to counsel of choice with the needs of fairness, and its "interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 152.

In this case, we believe the trial judge acted properly and in accordance with his broad discretionary authority in removing Cottrell's appointed attorneys. We agree with Cottrell's argument that his relationship with appointed attorneys, once established, should be afforded the same level of deference as that which is afforded to clients with retained counsel; however, that does not overcome the strong language from *Gonzales-Lopez, Sanders*, and the long line of other authorities delineating the wide latitude a trial judge possesses in balancing the right to counsel of choice with safeguarding the integrity of the judicial process. Here, the record reflects the trial judge removed Cottrell's attorneys to ensure Cottrell received a fair trial with adequate representation and to maintain the integrity of the judicial process. And, unlike *Gonzales-Lopez*, the State does not concede that the trial judge erroneously removed counsel—precluding a finding that the removal of Cottrell's attorneys was necessarily a structural error and instead requiring the Court to apply an abuse of discretion standard.

As Cottrell points out, *Sanders* grants the trial judge discretion in removing counsel, but he contends there must first be an evidentiary hearing with findings of fact before the judge can make such a decision. Indeed, this Court explained in *Sanders* that "as a procedural safeguard, an evidentiary hearing is appropriate to determine whether there is evidence to support counsel's removal." 341 S.C. 386, 391, 534 S.E.2d 696, 698. In *Sanders*, the trial judge removed one of the defendant's attorneys after the State indicated the attorney would be called as a witness to testify about her interactions with another State witness. Rather than holding a hearing to determine whether the attorney was a "necessary witness" to disqualify her under the Rules of Professional Conduct, the trial judge merely relied on the State's assertion and removed the attorney.

In Cottrell's case, these concerns are mitigated because in addition to the *in camera* discussions, the trial judge did in fact hold a hearing to allow Cottrell and his attorneys to be heard on the matter. We acknowledge it is somewhat problematic that the record does not indicate with specificity what the allegations of misconduct and disagreement actually entail, but the attorneys' confirmation that the accusations

were made and the absence of any rebuttal weighs in favor of affirming the trial judge's decision. Moreover, once one of Cottrell's attorneys admitted on the record that he believed Cottrell would likely prevail on PCR based on these allegations, we find the trial judge had little choice but to remove the attorneys to preserve the integrity of the trial in accordance with *Gonzales-Lopez* and *Sanders*. The right to counsel is not so absolute that it requires a trial judge to preside over a trial, exhausting the time of attorneys, jurors, and judicial staff despite an admission by a defendant's attorney that the integrity of the verdict is in doubt due to conduct falling below the accepted standards of the legal profession.

Based on the above analysis, we find the trial judge acted within the limits of his discretionary powers and did not violate Cottrell's Sixth Amendment right to counsel by removing his appointed attorneys and replacing them with new counsel. Had the attorneys denied the allegations or objected to the trial judge's remedy of removal, more complete findings of fact may have been appropriate, but the limited findings in the record are bolstered by the attorneys' acquiescence to the trial judge's ruling. Though deference is afforded to a defendant's attorney-client relationship once established, that relationship is limited by a trial judge's obligation to safeguard the integrity of the judicial process, as the trial judge did here. Thus, we find no error in the trial judge's removal and replacement of Cottrell's appointed attorneys.

## II. JUROR QUALIFICATION

Cottrell next argues the trial court erred in qualifying Jurors 148 and 450 after they made statements during the jury selection process indicating they would not consider evidence of a defendant's background in determining whether to impose the death penalty. After reviewing the record and the entirety of each juror's *voir dire*, we affirm the trial judge's decision to qualify the jurors.

Determinations of whether a juror is qualified are left to the sole discretion of the trial judge who has the opportunity to see and hear the jurors. *State v. Dickerson*, 395 S.C. 101, 115, 716 S.E.2d 895, 903 (2011). In reviewing the trial judge's qualification of jurors, the juror's responses must be examined in light of the entire *voir dire*, and the trial judge's decision will not be reversed unless it is wholly unsupported by the evidence. *Id.* "The ultimate consideration is that the juror be unbiased, impartial, and able to carry out the law as explained to him." *State v. Sapp*, 366 S.C. 283, 291, 621 S.E.2d 883, 887 (2005).

A full review of the *voir dire* process shows that neither of the jurors in question was "mitigation-impaired," and both identified themselves as "Type C" jurors, meaning they would not always vote for life or always vote for death. The jurors further stated they would wait until all evidence was presented before determining the appropriate sentence based on aggravating and mitigating evidence.[9] Both jurors expressed a willingness to follow the trial judge's instructions regarding the law, and both indicated they would not automatically impose the death penalty. *See Dickerson*, 395 S.C. at 116, 716 S.E.2d at 903 ("The circuit judge was more persuaded by the juror's consistent affirmation he would follow the law and wait to hear all of the evidence than by his apparent confusion over the State's burden, and we believe his ultimate determination of [the juror's] qualification to serve is supported by the record."). During the sentencing phase of Cottrell's trial, the trial judge repeatedly instructed the jurors that they would be required to consider any mitigating circumstance of any nature whatsoever, and explained what mitigating evidence could entail.

Based on the deference appellate courts afford to trial judges in matters of jury selection, and looking at the entirety of the *voir dire* process, along with the clear instructions given by the trial judge, we affirm the trial judge's qualification of Jurors 450 and 148.

---

[9] For example, Juror 450 explained to defense counsel, "Again, I think that everything is based on individual acts, and so overall to say that the death penalty is for everybody, I just don't think that's how it should be." Keeping in mind that the jurors had not yet been given any instructions on the law, we read the colloquies with Cottrell's attorneys asking whether the jurors would consider a defendant's background when determining the appropriate sentence and their responses of "no" to signify the jurors' intent to treat all defendants fairly and equally, and base their decision upon the facts of the case. To laypersons, the notion of equal treatment for all under the law is a touchstone of our justice system, and until a juror is fully informed that he may determine the appropriate sentence based on the unique backgrounds or characteristics of the defendant, it is not surprising that a juror would state that he intends to treat all defendants equally, regardless of their background.

## III. TESTIMONY OF NATHAN JOHNSON

Cottrell asserts the trial judge violated his due process rights, the Confrontation Clause, and his Fourth Amendment right against unreasonable seizures by excluding the testimony of Detective Nathan Johnson. We disagree.

### A. Background

Horry County Detective Nathan Johnson began investigating the murder of Rick Hartman after his body was found in November 2002. Johnson identified Cottrell as a possible suspect in the murder and notified the Myrtle Beach Police Department to inform its officers that Cottrell was a suspect and requested any additional information about him. MBPD Lt. Prock relayed this message to McGarry, knowing that he was personally familiar with Cottrell after arresting him for PWID earlier that year. McGarry had no contact or conversations with Johnson, instead only hearing from Prock that Cottrell was a possible suspect in a shooting death.

In a pre-trial hearing, the State proffered testimony from Johnson, Prock, and Guthinger in an effort to establish that McGarry had reasonably articulable suspicion to conduct a *Terry*[10] stop during his encounter with Cottrell as a matter of law. Much of Johnson's pre-trial testimony was dedicated to the facts he relied on in identifying Cottrell as a "suspect" in Hartman's murder, including Hartman's escort business, his relationship with Cottrell, and the circumstances surrounding his homicide. Lastly, Johnson explained that the entirety of his interactions with members of MBPD was to inform them there had been a homicide, a shooting was involved, and that he was looking at a couple of suspects, one of them being Cottrell.

At trial, the State called upon Prock to testify that she relayed Johnson's request to McGarry. In response to Prock's testimony, Cottrell sought to call Johnson to testify regarding the information he knew about Cottrell's involvement in the Hartman murder, arguing that Johnson did not have reasonable suspicion to identify Cottrell as a "suspect," making McGarry's *Terry* stop an unlawful seizure. The trial judge excluded Johnson's testimony on the basis that particular information about the Hartman murder investigation was not relevant, and even if it were, its

---

[10] *Terry v. Ohio*, 392 U.S. 1 (1968).

prejudicial effect and potential to mislead or confuse the jury substantially outweighed its probative value. However, the trial judge left the door open for Cottrell to call any witness he wished, including Johnson, to contradict or impeach anything that Prock testified to regarding the information that was passed to McGarry. After Prock testified, Cottrell did not call Johnson to contradict or impeach any of her statements.

Cottrell now argues the trial judge's ruling violated his constitutional right to present a defense, and his due process and Fourth Amendment rights. According to Cottrell, the lawfulness of McGarry's actions and Cottrell's level of culpability are dependent on whether Johnson possessed reasonable suspicion himself. Thus, Cottrell argues that the jury should have determined, as a matter of fact, whether Johnson possessed reasonable suspicion for a *Terry* stop.

*B. Discussion*

The right to present a complete defense is violated by the exclusion of defense evidence pursuant to a state rule of evidence only in rare circumstances. *Nevada v. Jackson*, 133 S.Ct. 1990, 1992 (2013). The right to present a defense is not without limits, and the right does not allow criminal defendants to present any evidence regardless of its admissibility under the rules of evidence. *See U.S. v. Lancaster*, 96 F.3d 734, 744 (4th Cir. 1996). Trial judges are afforded wide latitude in determining whether evidence is admissible. *State v. Torres*, 390 S.C. 618, 624, 703 S.E.2d 226, 229 (2010). "To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error of the ruling and the resulting prejudice, i.e., that there is a reasonable probability the jury's verdict was influenced by the challenged evidence or the lack thereof." *Fields v. Regional Medical Center Orangeburg*, 363 S.C. 19, 26, 609 S.E.2d 506, 509 (2005).

"The trial judge is given broad discretion in ruling on questions concerning the relevancy of evidence, and his decision will be reversed only if there is a clear abuse of discretion." *State v. Aleksey*, 343 S.C. 20, 35, 538 S.E.2d 248, 256 (2000). Even where evidence is relevant, it may still be excluded if the danger of unfair prejudice substantially outweighs its probative value. *Id.*; Rule 403, SCRE. The decision whether to admit evidence under this rule is again left to the sound discretion of the trial judge, and the decision will only be set aside in extraordinary circumstances where the discretion has been plainly abused. *United States v. Simpson*, 910 F.2d 154, 157 (4th Cir. 1990).

We reject Cottrell's broad assertions that his constitutional rights were violated by the exclusion of Johnson's testimony. Unquestionably, his right to present a defense and the confrontation clause are still subject to the rules of evidence, and Cottrell does not challenge the constitutionality of those rules. *See Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."). On the various grounds which Cottrell challenges the exclusion of Johnson's testimony—though we find no error in the trial judge's ruling—Cottrell must still establish prejudice, and we find none here. *See State v. Jenkins*, 412 S.C. 643, 651, 773 S.E.2d 906, 909 (2015).

From an evidentiary standpoint, we find no error in the trial judge's assessment that the risk of prejudice or confusion substantially outweighed the probative value, if any, of Johnson's testimony because McGarry's reasonable suspicion to conduct a *Terry* stop was not solely dependent on Johnson's request. It is well-established that reasonable suspicion is judged according to the complete facts and circumstances known to the officer at the time the seizure is made. *See U.S. v. Cortez*, 449 U.S. 411, 417–18 (1981). In this case, McGarry had knowledge beyond that which Johnson possessed, including the specifics of Cottrell's prior arrest, his connection to the drug trade, an allegation that Cottrell had held a woman hostage over an unpaid debt, and an outstanding charge in New York for attempted murder. Furthermore, the observations McGarry made on the night of his murder were unique to him, and Johnson had no knowledge as to what McGarry witnessed, such as whether Cottrell was illegally carrying a concealed weapon or the movement of Cottrell's hand toward his waistband, that spurred him to seize Cottrell. Lastly, for the purposes of the Fourth Amendment, we find the seizure did not occur at the moment McGarry began interacting with Cottrell, nor when McGarry informed him that he would like to perform a pat-down for weapons; rather, the seizure occurred only when McGarry placed his hands on Cottrell in an effort to restrict his movement, and at that time, witnesses corroborated that Cottrell's right hand was located near his waist band— an indicator to an experienced officer like McGarry that Cottrell may have been reaching for a weapon. *See California v. Hodari D.*, 499 U.S. 621, 626–29 (1991) (finding a suspect was not seized when he did not submit to a police officer's authority after receiving orders to stop, and the seizure only occurred once the officer tackled the suspect). Because Johnson's identification of Cottrell as a suspect was not the sole piece of information known to McGarry, it reduces the probative value of Johnson's testimony. On the other hand, the trial judge found Johnson's testimony

about the Hartman murder would have necessarily led to a "trial within a trial" that would not only confuse the issues and mislead the jury, but would cause substantial prejudice to Cottrell by exposing the jury to a litany of other crimes and bad acts which the parties had earlier agreed to keep unknown to the jury. Thus, we find no abuse of discretion in the trial judge's conclusion that the risk of confusion and prejudicial effects of Johnson's testimony substantially outweighed its probative value.

Additionally, based on the evidence presented, we find Cottrell was not entitled to a jury charge on reasonable suspicion, but rather, the focus for the jury in determining the lawfulness of the stop was the reasonableness of the manner in which McGarry acted. While the lawfulness of an arrest is within the province of the jury's deliberation, our manslaughter jurisprudence does not dictate that the existence of reasonable suspicion is necessarily a component for the jury to consider—the inquiry may be limited to analyzing the manner in which the officer acted, and whether he used a proportionate amount of force. This point is illustrated by the fact that *both* parties asked the trial judge to rule on the lawfulness of McGarry's *Terry* stop as a matter of law in pre-trial hearings. While the trial judge declined to rule at that time, preferring to see how the issue would develop at trial and what evidence the parties would offer, his reason for excluding Johnson's testimony is clarified by his post-trial order, where the trial judge found McGarry possessed reasonable suspicion as a matter of law. We are confident that after hearing Johnson's testimony, the trial judge was able to determine that Johnson himself possessed a reasonable suspicion, and therefore, his testimony was properly excluded to prevent it from unduly prejudicing or confusing the jury, instead allowing the jury to limit its inquiry to the reasonableness of the manner in which McGarry acted.

In summary, we find Cottrell's argument that the trial judge violated his rights to present a defense and to confront a witness are without merit. "A defendant's right to present a defense is not absolute: criminal defendants do not have a right to present evidence that the district court, in its discretion, deems irrelevant or immaterial." *United States v. Prince-Oyibo*, 320 F.3d 494, 501 (4th Cir. 2003). The trial judge stated appropriate reasons to exclude Johnson's testimony based on Rules

401 and 403, SCRE, and because Cottrell has not shown an abuse of discretion, we affirm the trial judge's evidentiary ruling.[11]

## IV. JURY INSTRUCTION ON MALICE

During the jury charge conference, Cottrell requested that the trial judge charge the jury not to infer malice from the use of a deadly weapon, in accordance with Cottrell's reading of *State v. Belcher*, 385 S.C. 597, 685 S.E.2d 802 (2009). The trial judge agreed to remove any instruction permitting the jury to infer malice from the use of a deadly weapon, but he refused to issue an express instruction that the jury could not infer malice from the use of a deadly weapon, noting that the jury has the right to make inferences from the evidence if it chooses to do so.

Cottrell argues that his due process rights were violated by the trial judge's refusal to affirmatively instruct the jury not to infer malice from the use of a deadly weapon because it allowed the prosecution to shirk its burden of proof during closing arguments by telling the jury to infer malice from Cottrell's gun. We disagree.

A trial court is required to charge the current and correct law in South Carolina. *State v. Brandt*, 393 S.C. 526, 549, 713 S.E.2d 591, 603 (2011). An appellate court will only reverse a trial court's decision regarding a jury charge if there is an abuse of discretion. *State v. Pittman*, 373 S.C. 527, 570, 647 S.E.2d 144, 166 (2007). This Court's landmark decision in *State v. Belcher* departed from the then-common practice of charging the jury that it may imply malice from the use of a deadly weapon, even where the defendant presents evidence that he used the weapon in self-defense. 385 S.C. 597, 685 S.E.2d 802 (2009). *Belcher* created a new standard whereby jurors could no longer be charged to infer malice from the use of a deadly weapon where evidence is presented that would reduce, mitigate, excuse, or justify the homicide. *Id.* at 600, 685 S.E.2d at 804. In an instructive footnote, the Court clarified that its opinion was narrowly tailored to apply to the

---

[11] Additionally, we find it difficult to discern what prejudice Cottrell suffered from the exclusion of Johnson's testimony and do not see a reasonable probability that the jury's verdict was influenced by the exclusion of Johnson's testimony. Not only does Johnson's testimony further support finding McGarry possessed reasonable suspicion and affirm the lawfulness of his actions, its admission would have also led to the introduction of evidence that Cottrell acted with malice when he killed McGarry, negating the existence of legal provocation or self-defense.

jury charge only, but did not "restrict the State from arguing to the jury for a finding of malice from the use of a deadly weapon, nor restrict a defendant from arguing the absence of malice or the presence of reasonable doubt in this regard." *Id.* at 612, n. 9, 685 S.E.2d at 810, n. 9.

Here, the trial judge fully complied with *Belcher* and did not charge the jurors that they could infer malice from Cottrell's use of the weapon. He instructed only that malice could be inferred from conduct showing a total disregard for human life. Accordingly, we find the trial judge did not abuse his discretion because his jury instructions complied with *Belcher*, and the additional charge requested by Cottrell was not supported by any authority. Furthermore, contrary to Cottrell's assertion that his case is similar to *Belcher* where it was entirely conceivable that the only evidence of malice was the defendant's use of a handgun, there is ample evidence in the record here that would allow the jury to infer malice based on Cottrell's conduct showing a total disregard for human life, including his indiscriminate shooting that struck several vehicles and a restaurant across the street, thereby endangering members of the public. Thus, we affirm the trial judge's instructions.

## V. CONTENTS OF THE JURY NOTE

Lastly, Cottrell argues the trial judge's refusal to inform defense counsel of the contents of the jury note indicating the jury's numerical division during sentencing deliberations violated his right to assistance of counsel, a fair jury trial, and a non-arbitrary verdict. We disagree.

Section 16-3-20(C) states that the trial judge must impose a life sentence if a capital sentencing jury cannot reach a recommendation after a reasonable deliberation. The determination of whether a jury has engaged in a "reasonable deliberation" is a matter committed to the trial judge's discretion. *Tucker v. Catoe*, 346 S.C. 483, 489, 552 S.E.2d 712, 715 (2001). In *Tucker*, the jury deliberated late into the night and resumed the next day; that afternoon, the foreman sent a note to the judge stating that the jury was unable to reach a verdict at that time and asking for a recharge on the juror's responsibilities. *Id.* at 491, 552 S.E.2d at 716. The judge then issued an *Allen* charge, which this Court found was unconstitutionally coercive under the totality of the circumstances, specifically finding the charge impermissible because it singled out the lone juror in the minority. *Tucker*, 346 S.C. at 493, 552 S.E.2d at 717. Additionally, the Court was critical of the judge's treatment of notes he received from the jury. The judge did not disclose the contents

of the first note, which stated the jury was deadlocked at 10–2 in favor the death penalty, but simply told the parties the jury wished to rehear testimony. *Id.* at 495, 552 S.E.2d at 718. The jury sent a second note the following day informing the judge it was divided 11-1 and that it was "hopelessly deadlocked" and not likely to ever get a unanimous verdict. *Id.* Emphasizing that it was relying on a "combination of withholding pertinent information from the parties, thereby depriving them of the facts necessary to make informed decisions; failing to instruct the jury to omit from its future communication any reference to the nature of its division; and giving an unconstitutionally coercive *Allen* charge, with its emphasis on a collective result," the Court granted the defendant a new sentencing proceeding. *Id.*

Unlike in *Tucker*, the note sent by the jury in Cottrell's case did not state that it was hopelessly deadlocked. The note simply indicated what the jurors' vote was and inquired as to the next step. The trial judge acted within his discretion and determined that the jury had not yet reached a deadlock after "reasonable deliberation" because it had only been deliberating for two hours at that point. Without a deadlock, the trial judge found it was not appropriate to give an *Allen* charge, instead simply telling the jury to continue with its deliberations. Furthermore, the trial judge followed the Court's instructions in *Tucker* and advised the jury not to notify him of its specific vote counts in future notes. The trial judge notified the parties of the contents of the jury's note, withholding only the numerical split.

Cottrell cites to *United States v. Maraj*, 947 F.2d 520, 525 (1st Cir. 1991), and *State v. Tremblay*, 820 A.2d 571, 575–76 (Me. 2003) to demonstrate that the trial judge violated Cottrell's rights by not disclosing the numerical split. In both cases, the courts found the respective trial judges should have disclosed knowledge of numerical splits to the parties because it deprived them of an opportunity to be adequately heard before the trial judges responded to the juries' inquiries. However, in both *Maraj* and *Tremblay*, the courts found the failure to disclose the numerical split was harmless error and the defendants suffered no prejudice. *See Maraj*, 947 F.2d at 526 (holding whether the failure to disclose the numerical split was viewed under the more strict standard for constitutional violations or under less stringent standard applicable to most trial errors, the error was harmless); *Tremblay*, 820 A.2d at 577 (explaining that because the note indicated the jury "reached a relative standstill in deliberations and needed further instructions on how to proceed," and was not "substantive inquiry into fact or law" the court's limited disclosure of the contents made the defendant less susceptible to prejudice).

Accepting Cottrell's argument that the trial judge should have disclosed the numerical split, we agree with the State that the decision is subject to a harmless error analysis. Because the trial judge concluded the jury had not yet reached a deadlock such that he needed to give an *Allen* charge, even if Cottrell had been notified of the numerical split, there was nothing further for him to do at the time to protect his rights. *See Maraj*, 947 F.2d at 526 ("Moreover, had the full note been contemporaneously disclosed, there was nothing more that defense counsel could appropriately have done to protect their clients' rights. On this record, we fail to see any realistic possibility that the partial nondisclosure prejudiced the defense, contributed even fractionally to the convictions, influenced the jury en route to the verdicts, swayed the trial's outcome, or adversely affected the appellants' substantial rights."). Accordingly, we affirm the trial judge's ruling.

## PROPORTIONALITY REVIEW

Pursuant to South Carolina Code Section 16-3-25(C) (2015), this Court must review the proportionality of Cottrell's death sentence. From our review of the record, we find the sentence was not imposed as a result of passion, prejudice, or any other arbitrary factor. The evidence clearly supports the jury's finding of statutory aggravating circumstances. *See* S.C. Code Ann. § 16-3-20(C). Lastly, the death penalty has been imposed in similar cases where the aggravating circumstances involved the death of a police officer. *See Sapp*, 366 S.C. at 294, 621 S.E.2d at 888; *Aleksey*, 343 S.C. at 36, 538 S.E.2d at 256.

## CONCLUSION

Based on the foregoing, we find the trial court committed no reversible error and Cottrell's conviction and sentence for the murder of Officer McGarry are **AFFIRMED**.

**BEATTY, C.J., KITTREDGE and JAMES, JJ., concur. FEW, J., concurring in result only in a separate opinion.**

**JUSTICE FEW:** I concur in the result reached by the majority. I disagree, however, with two points in the majority's analysis.

## I. Removal of Attorneys

First, I disagree that a trial court has "discretion" to remove trial counsel over the defendant's objection as an exercise of the court's duty to ensure the defendant receives a fair trial. This Court has never before recognized such discretion, nor has any court of which I am aware. In each case cited by the majority to support its holding, the trial court made a specific factual finding that the attorney was legally disqualified due to a conflict of interest or a likelihood the attorney would be a witness at trial. The trial court's failure to make such specific findings in this case is the error we address in this appeal,[12] and clearly distinguishes each of those cases from this one. The majority has taken those cases far out of their proper context, and the cases do not support the majority's holding.

For example, the majority states "the Sixth Amendment right to counsel is 'circumscribed by the trial court's obligation to safeguard the integrity of the proceedings and ensure trials are conducted according to the ethical standards of the profession,'" quoting *State v. Sanders*, 341 S.C. 386, 389, 534 S.E.2d 696, 697 (2000). *Sanders*, however, involved an allegation the attorney would be called as a "necessary witness" in the trial, and thus was legally disqualified pursuant to Rule 3.7 of the South Carolina Rules of Professional Conduct. *Id.*; *see* Rule 3.7, RPC, Rule 407, SCACR (providing, "A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness . . . ."). In *Sanders*, we actually reversed the trial court's decision to remove counsel even though the trial court's ruling was based on a finding of legal disqualification. 341 S.C. at 390, 534 S.E.2d at 698. *Sanders* does not support the existence of "discretion" to remove an attorney without any finding of a legal basis for disqualification.

---

[12] Cottrell's own statement of the issue before us is, "The trial court's removal of the lawyers appointed to represent [Cottrell], over the objection of both [Cottrell] and his lawyers, and *in the absence of any findings justifying this interference* with an established attorney-client relationship, violated [Cottrell's] rights to counsel and due process under the Sixth and Fourteenth Amendments . . . ." Appellant's Br. 10 (emphasis added).

*Sanders* relied on *United States v. Howard*, 115 F.3d 1151 (4th Cir. 1997), and *United States v. Williams*, 81 F.3d 1321 (4th Cir. 1996). In *Williams*, the district court disqualified counsel based on its finding counsel had a conflict of interest. 81 F.3d at 1323. Williams then offered to supply auxiliary counsel to cross-examine the witness whose testimony provided the primary basis for counsel's conflict, but the district court elected not to permit the arrangement. *Id.* Later, Williams claimed the witness would not testify because she would assert a privilege, and thus the potential conflict was not a concern. *Id.* The district court rejected the argument and permitted the government to call the witness. *Id.* Thus, when the Fourth Circuit stated "disqualification of Williams's counsel was well within the district court's discretion," 81 F.3d at 1325, the appellate court was referring to the trial court's discretion to reject the arrangement proposed to eliminate the conflict, not discretion to remove counsel when no disqualifying reason existed.

In *Howard*, which the majority in this case quotes directly, the district court made two separate factual findings to support its conclusion counsel was legally disqualified—counsel had a conflict of interest and counsel was likely to be a necessary witness. 115 F.3d at 1155. However, the defendant attempted to waive the conflict and argued counsel would not be required to testify. *Id.* Reviewing the district court's decision not to permit the waiver and not to accept the argument counsel would not testify, the Fourth Circuit stated the "right to be represented by an attorney of his own choosing . . . is circumscribed by . . . the obligation of trial courts to safeguard the integrity of the proceedings before them," and "a trial court 'must have sufficiently broad discretion to rule without fear that it is setting itself up for reversal on appeal' if it disqualifies a defendant's chosen lawyer." *Id.* (quoting *Williams*, 81 F.3d at 1324)). Therefore, the "discretion" referred to by the Fourth Circuit is not the discretion to do what the trial court did here, but only that "district courts 'must be allowed substantial latitude' in rejecting waivers of this sort." *Id.*

The majority also relies on *State v. Justus*, 392 S.C. 416, 709 S.E.2d 668 (2011). In *Justus*, the "the solicitor filed a motion entitled 'Motion to Have the Court Determine Whether Defense Counsel has an Actual Conflict of Interest.'" 392 S.C. at 417, 709 S.E.2d at 669. The motion was based on the solicitor's contention that defense counsel represented the State's lead investigator, who was a potential witness in the case. 392 S.C. at 417-18, 709 S.E.2d at 669. At a hearing on the motion, the defense attorney testified she represented the investigator only for a limited purpose, which had been completed, and she was no longer representing him. 392 S.C. at 418, 709 S.E.2d at 669. The resolution of the motion, therefore, turned on the factual

question of whether the defense attorney continued to represent the investigator, and thus whether or not a conflict of interest would arise if he testified. We stated,

> We acknowledge that it is a close question whether [counsel]'s representation of [the investigator] was ongoing or had concluded. Moreover, it is fairly debatable whether [the witness]'s potential testimony presented an actual conflict of interest. However, given the conflicting evidence before the trial court, and giving deference to its findings of fact, we find no abuse of discretion in the disqualification of [counsel].

392 S.C. at 419, 709 S.E.2d at 670.

The "discretion" to which we referred in *Justus* was discretion to make the factual finding necessary to determine if a potential conflict of interest existed, not to simply remove counsel with no finding of legal disqualification. As it did with *Sanders* and *Howard*, the majority has taken *Justus* out of context, and *Justus* does not support the majority's holding.

Based on *Sanders*, *Howard*, and *Justus*, the majority treats the trial court's ruling to dismiss counsel as one "largely addressed to the trial judge's discretion," and states "we believe the trial judge acted . . . in accordance with his broad discretionary authority in removing Cottrell's appointed attorneys." I strongly disagree with the majority's characterization of the trial court's authority. In my opinion, a trial court may not terminate the attorney-client relationship between a criminal defendant and his counsel over the defendant's objection without first making specific findings that a valid basis for disqualification exists. *See generally United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48, 126 S. Ct. 2557, 2563, 165 L. Ed. 2d 409, 419 (2006) ("The right to select counsel of one's choice . . . has been regarded as the root meaning of the constitutional [Sixth Amendment's] guarantee. . . . Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received. To argue otherwise is to confuse the right to counsel of choice—which is the right to a particular lawyer regardless of comparative effectiveness—with the right to effective counsel—which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed."); *Faretta v. California*, 422 U.S. 806, 819-20, 95 S. Ct. 2525, 2533, 45 L. Ed. 2d 562, 572-73 (1975) ("The right to defend is given directly to the accused; for it is he who

suffers the consequences if the defense fails. . . . To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment.").[13]

That does not mean the trial court's error requires a new trial. First, I would remand this case to the trial court and require the court to make findings as to whether a valid basis for disqualification exists. Even without a remand, however, I would not reverse the trial court and order a new trial. I would instead affirm on the narrow basis that the facts in this record do not require a new trial.

As then Solicitor Hembree stated at the hearing the trial court conducted to address this question, this was an "extreme situation." Prior to the hearing, both Solicitor Hembree and then deputy solicitor Richardson submitted memoranda to the trial court in which they described separate conversations each had with Cottrell's first and second chair attorneys. Solicitor Hembree's memo documents the statement of first chair counsel that "in her career practicing law she had never worked with any lawyer more dishonest or unethical than [second chair]" and "she could not wait to get this case concluded just to get away from him." Deputy Richardson's memo documents the statement of second chair that first chair "was lazy, not easily motivated, and drank too much." Deputy Richardson's memo states second chair "said that he had to take the lead on getting started for this trial because [first chair] would never request discovery, look into getting experts, and investigate the details of the shooting or possibilities of misconduct" by officer McGarry.[14]

---

[13] It makes no difference that counsel was appointed. *See Morris v. Slappy*, 461 U.S. 1, 23 n.5, 103 S. Ct. 1610, 1622 n.5, 75 L. Ed. 2d 610, 627 n.5 (1983) (Brennan, J., concurring) ("But the considerations that may preclude recognition of an indigent defendant's right to choose his own counsel . . . should not preclude recognition of an indigent defendant's interest in continued representation by an appointed attorney with whom he has developed a relationship of trust and confidence. . . . [A]n indigent defendant has an important interest in a relationship that he might develop with his appointed attorney."); *see also Cuyler v. Sullivan*, 446 U.S. 335, 344-45, 100 S. Ct. 1708, 1716, 64 L. Ed. 2d 333, 344 (1980) (stating, in a different context, "we see no basis for drawing a distinction between retained and appointed counsel that would deny equal justice to defendants who must choose their own lawyers").

[14] *See State v. Cottrell*, 376 S.C. 260, 265, 657 S.E.2d 451, 454 (2008) (finding the evidence presented at Cottrell's first trial supported the "reasonable inference . . . that [officer McGarry] reacted in an impermissibly aggressive manner, physically

The trial court met privately with each defense attorney before the hearing. At the hearing, the trial court stated he was able to verify "the memoranda which were provided to me are correct" that both defense attorneys had accused the other of "what I consider to be serious misconduct." The court explained that "each of defense counsel believed that the allegations were correct" and "both counsel told me that in their opinion . . . [Cottrell's] defense was being jeopardized." While I believe the trial court erred by not making specific findings, the court explained, "I have been very careful not to go into the specifics . . . , but there have been allegations involving dishonesty, unethical conduct, personal problems that should be addressed, all sorts of things that I believe . . . would be of grave concern."

In a written order, the trial court stated first chair "made serious allegations of dishonesty and unethical conduct against her co-counsel," and second chair "challenged [first chair's] competence, work ethic, and personal life." The court stated, "Each acknowledged having made the statements against co-counsel and that they believed the statements to be true."

In conclusion, the trial court should have made specific findings on the record, and given that it did not do so, this Court should remand with a requirement that those findings be made now. However, I acknowledge the trial court was in a very difficult position. In ten years as a trial judge in which I presided over hundreds of criminal trials and numerous capital cases, I never faced an "extreme situation" like this. I am not sure how I would have handled it if I had. Reading this record convinces me that a dilemma of this magnitude will almost never arise. While I steadfastly disagree with the majority's characterization of the trial court's power to resolve this problem as one of "wide latitude" or "considerable discretion," I do believe that on these unique facts the failure of the trial court to make specific findings that would form the basis for a legal disqualification does not warrant a new trial.

## II.    Contents of the Jury Note

That it is error for a trial court to refuse to inform defense counsel of the contents of a note from the jury should require no explanation. In my view, a trial court has no authority to refuse to inform trial counsel of any information regarding

---

assaulting and then shooting [Cottrell] when he exercised his constitutional right to walk away" and "evidence in this case presented a jury question whether the arrest was lawful but effectuated through the victim's unnecessary use of violence").

the conduct of a trial.  If this Court takes seriously the duty of counsel to provide effective assistance under the Sixth Amendment, then we must also recognize the elementary principle that counsel must have available the information necessary to fulfill that duty.  The idea that a trial court may unilaterally decide not to provide such information to trial counsel in any proceeding—particularly the sentencing phase of a capital trial—is absurd.

As to whether this obvious error requires reversal, Cottrell has not articulated any action trial counsel could have taken if the information was disclosed that would have changed the way the trial court conducted the sentencing hearing or altered its outcome.  I agree, therefore, with the majority's conclusion the error was harmless.